**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 11 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MORRISON KNUDSEN
CORPORATION, dba MK-Ferguson
Company, an Ohio corporation,

        Plaintiff-Counter-
        Defendant-Appellant/
        Cross-Appellee,

v.

FIREMAN'S FUND INSURANCE
COMPANY, a California corporation,

        Defendant-Appellee,

and

GROUND IMPROVEMENT
TECHNIQUES, INC., a Florida
corporation,

        Defendant-Counter-
        Claimant-Appellee/
        Cross-Appellant.

No. 97-1095

No. 97-1247

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 95-OK-2510-RC)

Daniel R. Frost, of Fairfield and Woods, P.C., Denver, Colorado, (Neil T. Duggan and Brian D. Wallace, of Fairfield and Woods, P.C., with him on the brief) for Appellant/Cross-Appellee.

Frederick Huff, Law Offices of Frederick Huff, Denver, Colorado, for Appellee, Fireman's Fund Insurance Company.

Steven Roger Schooley, of Holland & Knight, LLP, Orlando, Florida, for Appellee-Cross-Appellant, Ground Improvement Techniques, Inc.

---

Before **SEYMOUR,** Chief Judge**, LUCERO,** and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

Morrison-Knudsen Corporation (MK), a federal contractor, terminated its subcontractor, Ground Improvement Techniques (GIT), for an alleged default, and sued GIT for damages.[1]  GIT counterclaimed for wrongful termination.  GIT's claimed damages included payment for completed work under the subcontract, equitable adjustments to the subcontract price for increased costs caused by MK, damages claimed by lower-tier subcontractors, and attorney's fees.  MK unsuccessfully moved for judgment as a matter of law, claiming insufficiencies in GIT's evidence of damages and of MK's liability.  A jury found the termination wrongful and awarded GIT roughly half the damages claimed.

---

[1]MK also sued Fireman's Fund, GIT's surety.  While Fireman's Fund is a party to this appeal, there are no disputed issues peculiar to Fireman's Fund, and its potential liability is entirely derivative of GIT's.  This opinion thus refers simply to "GIT."

On appeal, this court rejects MK's challenge to the liability verdict but reverses the damage award. GIT's evidence of several of its categories of damages was insufficient, and its claims on behalf of its lower-tier subcontractors were premature, as GIT had not yet itself settled with all of its subcontractors. Because the jury returned a general verdict, this court cannot determine whether any parts of the jury's award were for allowable categories of damages supported by sufficient evidence. We thus vacate the judgment and remand for a new trial limited to the issue of damages.

I.      FACTUAL AND PROCEDURAL BACKGROUND

The United States Department of Energy hired MK in 1983 to manage its Uranium Mill Tailing Remedial Action (UMTRA) project, a cleanup of radioactive mill tailings at sites around the country. MK subcontracted with GIT in March 1995 to clean up the Slick Rock, Colorado, site. GIT hired several lower-tier subcontractors ("subs"), including R.N. Robinson & Son, for excavation; Bogue Construction, for trucks; Keers Environmental, for asbestos abatement; and GA Western, for bridge work.

The MK-GIT Subcontract ("the contract") obligated GIT to complete the project by December 1996. The contract price was roughly $9.3 million. The contract incorporated almost verbatim several standard federal clauses for fixed-price construction contracts, including clauses governing terminations for default and convenience. It also incorporated by reference the federal regulations

governing the compensability of contractors' costs in the event of a termination for convenience. The contract provided that the law applicable to government procurement would govern all substantive issues in any litigation.

The project did not go well. GIT and its subs encountered delays, difficulties, and increased costs. GIT attributed these to MK's defective specifications, failure to timely secure permits, rigid interpretation of specifications and safety requirements, and propensity to reject proposed work plans. During the contract's performance, GIT requested extra compensation and extensions of time because of delays to, changes in, and increased costs of the work which GIT attributed to MK. GIT's central theory is that its plan to complete the project before the deadline displeased MK, who could not then earn the maximum possible fees from DOE. MK, in GIT's view, thus sought to hinder and delay the work. MK, on the other hand, attributed the delays and increased costs to errors, omissions, and delinquencies by GIT and its subs.

In September 1995 MK terminated GIT for default. The contract allowed MK to do so if GIT was not prosecuting the work with a diligence that would ensure its timely completion. MK simultaneously sued GIT for damages caused by its alleged default. While requiring GIT to cease work and vacate the site, MK also directed it to perform certain cleanup work and leave certain equipment behind. MK allegedly retained and used that equipment during the ensuing litigation. After the termination, MK denied almost all of GIT's requests for

change orders to increase its compensation under the contract.  MK also failed to pay GIT for various parts of the completed work and for the post-termination work and retention of equipment.

GIT protested the termination and urged MK to let it complete the project or bid on the reprocurement of the work.  MK ignored these requests.  In February 1996 GIT counterclaimed for wrongful termination, seeking damages in the form of payment for completed work under the contract and compensation for additional costs occasioned by MK and not contemplated by the contract.

Contemporaneously, the subs were demanding payment from GIT.  After Keers filed suit, GIT settled its claims.  At the time of the GIT-MK trial, however, GIT was still involved in litigation with Robinson and had not settled with or paid Bogue or GA Western.  In its counterclaim, GIT also sought damages on behalf of the subs.

The district court eventually set trial for November 1996.  In October 1996 GIT supplemented its pretrial damages disclosure, increasing the amount claimed from roughly $8.4 to $11.4 million and increasing the number of categories of damages.  MK repeatedly but unsuccessfully challenged the supplementation, arguing that GIT had changed its damage theory just weeks before trial and was using previously undisclosed documentation.

Twelve days before trial, the court assigned the case to a new judge.  That judge presided over a three-week trial, which focused on whether MK's

termination of GIT had been wrongful. GIT presented one witness, its secretary/treasurer, Kip Cooper, to explain its damage exhibits and claims.

Before the court submitted the case to the jury, MK filed several motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). MK made several challenges to GIT's damage evidence. It argued, *inter alia*, that GIT had not presented evidence of the types of damages allowed by the contract, or of causation, or of its attorney's fees. The court denied MK's motions. MK also argued in a jury-instruction conference that the contract barred GIT from recovering on behalf of subs whose claims GIT had not settled and paid. The court rejected MK's proposed jury instruction to that effect.

The jury found the termination wrongful and awarded GIT $5.6 million. MK then renewed most of its motions for judgment as a matter of law under Rule 50(b), and the court denied them again.

II.     DISCUSSION

A.     GIT's Alleged Discovery Violation

MK argues that GIT's supplemental damage disclosure was subject to mandatory exclusion under Federal Rule of Civil Procedure 37(c)(1).[2] On appeal,

---

[2]A party must automatically disclose "a computation of any category of damages claimed" and must produce for inspection all materials on which it bases its computation. Fed. R. Civ. P. 26(a)(1)(C). A party must supplement or correct its disclosure upon learning that it is materially incomplete or incorrect. *See* Fed. R. Civ. P. 26(e)(1). A party who breaches those duties may not use any undisclosed material as evidence unless it proves that its failure to disclose was

(continued...)

MK makes three arguments based on this alleged discovery violation. Most broadly, MK asserts that GIT's untimely change in damage theory so prejudiced MK's ability to conduct the trial as to require a new trial on all issues. MK also argues that the trial court abused its discretion in denying MK's motion to continue the trial to allow it time to respond to GIT's disclosure. Finally, MK argues that the court abused its discretion in not striking GIT's revised damages claim, thereby suggesting a need to remand for a new trial on damages.

MK has not adequately developed its first two arguments, which seek a new trial on all issues based on the prejudice of GIT's disclosure[3] or on the trial court's denial of a continuance.[4] As for its third argument, MK has consistently

---

[2](...continued)
harmless or substantially justified. *See* Fed. R. Civ. P. 37(c)(1).

[3]MK urges this court to order a new trial on all issues in order to show litigants that it will not tolerate breaches of discovery rules. MK baldly asserts that the alleged error in this case "rippled throughout the entire trial and prevented MK from adequately presenting its best possible case." But MK cites no authority to support, or provide standards for applying, its theory that a court of appeals should in some cases order a retrial of all issues because of allegedly pervasive prejudice caused by a discovery violation concerning one issue.

[4]The denial of a continuance is "reviewable only under the standard of arbitrary abuse of discretion, upon a showing of manifest injustice." *United States v. Johnson*, 909 F.2d 1440, 1441–42 (10th Cir. 1990) (citing *United States v. Bradshaw*, 787 F.2d 1385, 1392 (10th Cir. 1986)). This court will not reverse "unless we conclude that the denial was arbitrary or unreasonable and materially prejudiced the appellant." *United States v. West*, 828 F.2d 1468, 1469 (10th Cir. 1987) (citing *Bradshaw*, 787 F.2d at 1392). We have established several factors to consider in reviewing the denial of a continuance. *See West*, 828 F.2d at 1470 (listing factors from *Bradshaw*, 787 F.2d at 1392). Facing this very deferential

(continued...)

emphasized the prejudice that it suffered in having to assimilate GIT's allegedly new theory and documentation of damages mere weeks before trial. As discussed below, however, this court has determined that it is necessary to vacate the award of damages and remand for a new trial on that issue. This appeal has thus eliminated any time-based prejudice and has essentially mooted any abuse in the court's ruling.[5] *Cf. Wylie v. Ford Motor Co.*, 502 F.2d 1292, 1295 (10th Cir. 1974) (holding that remand for new trial obviated need to decide whether court had abused discretion in failing to impose discovery sanction). Even if GIT did untimely change its theory or disclose documents, this appeal and remand will have afforded MK ample time to investigate and rebut GIT's damage claims before the retrial.

---

[4](...continued)
standard of review, MK does not even address the *Bradshaw* factors. It only asserts generally that the prejudice of having to respond to GIT's new damage theory was "obvious," and that the denial of a continuance was "terribly unfair."

[5]In some cases the need to sanction a party for discovery violations may be so clear and pressing that this court, in remanding for a new trial, would direct the trial court to sanction or consider sanctioning a party. *See, e.g.*, *Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d 599, 605 n.7 (10th Cir. 1997). In this case, however, the record on appeal does not suggest that GIT committed a flagrant or willful violation of the sort that might require a sanction on remand. *Cf. Ryder v. City of Topeka*, 814 F.2d 1412, 1427 (10th Cir. 1987) (holding that discovery violation was not so prejudicial as to require new trial, but remanding for trial court to consider disciplinary action or sanction).

-8-

B.    Liability

MK makes but one argument which, if accepted, would require reversal of the liability portion of the judgment.  It asserts that the court erred in denying a proposed jury instruction.  The proposed instruction specified that, in order to prove a delay "excusable" under the contract, GIT had to show both that something beyond its control delayed part of its work, and that the problem would have delayed completion of the entire project.

1.    *The Applicable Law and the Instruction Given*

The contract's default-termination clause, GP 56, incorporated essentially *verbatim* the standard federal Default clause for fixed-price construction contracts.  *See* 48 C.F.R. § 52.249–10 (1997).  That clause is part of the Federal Acquisition Regulation System (FAR).  *See* 48 C.F.R. pts. 1–99.  As incorporated in the contract, the clause allowed MK to terminate GIT if the work had been delayed, not for excusable reasons, but by GIT's lack of diligence:

A.    If [GIT] refuses or fails to prosecute the work . . . with the diligence that will ensure its completion within the time specified in this Subcontract, including any extension . . . [MK] may . . . terminate [GIT's] right to proceed . . . .

B.    [GIT]'s right to proceed shall not be terminated nor [GIT] charged with damages under this article, if:

(1)    The delay in completing the work arises from causes . . . beyond the control and without the fault or negligence of [GIT].  [A list of examples follows.]

-9-

*See* 48 C.F.R. § 52.249–10. The clause further provided that a wrongful default-termination would be treated as a termination for convenience:

> C. If, after termination . . ., it is determined that [GIT] was not in default or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

The contract's Disputes clause, GP 41, provides that "[a]ny substantive issue of law in [litigation concerning the contract] shall be determined in accordance with the body of law applicable to procurement of goods and services by the Government." Accordingly, this court must interpret the above default-termination clause, and the rest of the contract, in light of the regulations and case law governing the interpretation of federal contracts. The controlling regulations have since 1984 been the FAR. *See* 48 C.F.R. pts. 1–99; *see generally* John Cibinic, Jr., & Ralph C. Nash, Jr., *Administration of Government Contracts* 14–22 (3d ed. 1995). The relevant caselaw has been developed mainly by the boards of contract appeals found in various federal departments; the Court of Federal Claims and its predecessor trial courts; and the Federal Circuit and its predecessor appellate courts. *See generally id.* at 22–23, 1239–41, 1311–16.

The sole issue of liability at trial was whether the default-termination was wrongful. By terminating GIT, MK indicated a belief that GIT was so far behind schedule, without adequate excuse, as to show a lack of diligence that made the project's timely completion uncertain. The termination was proper if such a

belief was reasonable.[6]  In challenging the termination, GIT claimed that it had been entitled to extensions of time for various "excusable delays" under GP 56B. The jury's general verdict simply indicated that it found the termination wrongful. That conclusion may have depended on a finding that GIT was entitled to one or more excusable delays.  Any error in the instruction defining excusable delays would thus prevent this court from affirming the verdict on liability.  *See City of Wichita, Kan. v. United States Gypsum Co.*, 72 F.3d 1491, 1495 (10th Cir. 1996) (requiring reversal if jury may have relied on erroneous instruction in reaching verdict, even if such reliance is unlikely).

MK has appealed the court's refusal to give an instruction specifying that excusable delays had to threaten to delay completion of the project as a whole. This court reviews a trial court's refusal to give a particular instruction for abuse of discretion.  *See, e.g.*, *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1248 (10th Cir. 1998).  That deferential review is superseded, however, by this court's *de novo* review of the instructions given to determine whether, in the absence of the refused instruction, they misstated the applicable law.  *See, e.g.*, *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir. 1998); *Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515, 1526 (10th Cir. 1997).  This court reviews the

---

[6]In an instruction unchallenged on appeal, the court directed the jury to find whether GIT's performance had made MK "justifiably insecure" about the project's timely completion.

instructions as a whole to determine whether they "adequately apprised the jury of the issues and the governing law." *Wolny*, 133 F.3d at 765.

In this case, the court's instruction #18, "Contractual Excuse of Delays," told the jury that "[f]or each claim of excusable delay, GIT has the burden to prove that it met the subcontract requirements for excusable delay." The instruction noted that "[t]he subcontract requirements for establishing an excusable delay are explained in instruction 22." Instruction #22, in turn, concerned "GIT's Counterclaim for Extra Work, Delays and Acceleration — Essential Elements." That instruction told the jury what GIT had to prove in order to recover damages on its delay claims. It required GIT to show that something beyond its control or fault, and unauthorized by the contract, had delayed its work; that it had notified MK; and that MK had "refused to allow GIT the additional time necessary to complete the work."[7]

MK proposed an instruction listing similar elements of excusable delay. MK's instruction did not require proof that MK had "refused to allow GIT the additional time necessary to complete the work." It did, however, require proof that the delay was a "critical delay." It defined a critical delay as one that "would delay not just the particular activity at issue, but the overall completion date of the Work." The court declined over MK's objection to give this instruction.

---

[7]The relevant part of instruction #22 is quoted in its entirety *infra* at pages 19–21, in juxtaposition to MK's proposed instruction.

MK argues that a contractor is not entitled to an excusable delay unless it proves that the delay was on the project's "critical path," i.e., that it would delay completion of the entire project. MK thus asserts that the court erred "in refusing to instruct the jury on the element of 'criticality.'" GIT responds that MK has not identified any part of the contract or any cases using the terms "critical path" or "criticality" or mandating jury instructions on those terms. Alternatively, GIT claims that the instructions as a whole were sufficient. MK does not claim that the contract expressly refers to the "critical path" or requires that excusable delays affect the project's overall completion. It argues instead that the latter requirement is a well-established rule of federal-contracting law.

MK's description of federal-contracting law is correct. The leading treatise explains that "[a] contractor is not entitled to relief upon the mere occurrence of an event that qualifies as an excusable delay. The contractor must show that the event caused delay to the overall completion of the contract." Cibinic & Nash, *supra*, at 577 (emphasis omitted); *see, e.g.*, *Essential Constr. Co.*, ASBCA No. 18491, 78–2 B.C.A. (CCH) ¶ 13,314, at 65,122, 1978 WL 2282 (1978); *AB-Tech Constr., Inc.*, VABCA No. 1531, 82–2 B.C.A. (CCH) ¶ 15,897, at 78,823–11, 1982 WL 7201 (1982). A subsection of that treatise entitled "Delay of Overall Completion Required" discusses the case law establishing that a contractor "is not entitled to an excusable delay unless it can prove that the time lost delayed the completion of the job. It is not sufficient to establish that some work was

prevented; the work prevented must be work that will delay the overall completion of the job." Cibinic & Nash, *supra*, at 579 (citations omitted); *see generally id.* at 579–80, 583–84.

The two cases MK cited below and in its opening brief plainly state and apply the requirement MK sought to include in the jury instructions, albeit without reference to the "critical path." *See Essential,* 78–2 B.C.A. (CCH), at 65,122; *AB-Tech*, 82–2 B.C.A. (CCH), at 78,823–11. One of those opinions specifies that "persuasive evidence showing that [the delay] extended the overall completion of the contract work . . . is *an essential element of the proof* required to support a [claim for a] time extension." *Essential*, 78–2 B.C.A. (CCH), at 65,124 (emphasis added). A third case that MK cites in its reply brief plainly applies that requirement while using "critical path" terminology. *See Harrison Western/Franki-Denys (JV)*, ENG BCA No. 5506, 93–1 B.C.A. (CCH) ¶ 25,406, at 126,586–87, 1992 WL 230234 (1992). In a recent opinion interpreting the default-termination clause at issue in this case, the Armed Services Board of Contract Appeals acknowledged the potentially dispositive importance of the requirement that an excusable delay affect completion of the contract as a whole:

> The outcome of this appeal is controlled by the principle that, where a contractor attributes its delayed performance to excusable causes, the contractor bears the burden of proving that time lost due to an excusable delay actually delayed completion of the entire job. Appellant has failed to satisfy that burden . . . .

*D.J. Simons Constr. Co.*, ASBCA No. 41336, 93–1 B.C.A. (CCH) ¶ 25,306, at

126,066, 1992 WL 187585 (1992) (citing *Arctic Corner, Inc.*, ASBCA No. 29405,

88–1 B.C.A. (CCH) ¶ 20,396, at 103,188, 1987 WL 46155 (1987)).

The parties' dispute on this issue has been exacerbated by MK's use of

"critical path" terminology in its proposed instruction.  "Critical Path

Methodology" (CPM) is a term of art for a method of scheduling and

administering construction contracts.  The Court of Claims has explained that

CPM enables contractors performing complex projects to identify a critical path

of tasks that must each be completed before work on other tasks can proceed.  A

delay on the critical path will thus delay the entire project:

> Essentially, the critical path method is an efficient way of organizing
> and scheduling a complex project which consists of numerous
> interrelated separate small projects.  Each subproject is identified and
> classified as to the duration and precedence of the work.  (E.g., one
> could not carpet an area until the flooring is down and the flooring
> cannot be completed until the underlying electrical and telephone
> conduits are installed.) The data is then analyzed, usually by
> computer, to determine the most efficient schedule for the entire
> project.  Many subprojects may be performed at any time within a
> given period without any effect on the completion of the entire
> project.  However, some items of work are given no leeway and must
> be performed on schedule; otherwise, the entire project will be
> delayed.  These latter items of work are on the "critical path."  A
> delay, or acceleration, of work along the critical path will affect the
> entire project.

*Haney v. United States*, 676 F.2d 584, 595 (Ct. Cl. 1982); *see also, e.g., Wilner v.*

*United States*, 24 F.3d 1397, 1398 n.5 (Fed. Cir. 1994) (en banc) ("'[O]nly

construction work on the critical path had an impact upon the time in which the

project was completed.'" (quoting *C.M. Shupe, Inc. v. United States,* 5 Cl. Ct. 662, 728 (1984))).

Courts often use CPM to resolve disputes over excusable-delay claims. *See* Cibinic & Nash, *supra*, at 584. CPM provides a useful, well-developed nomenclature and analytic framework for expert testimony. While CPM has generated a technical terminology, the legal requirement that it is used to analyze is general and commonsensical: a contractor must prove that a delay affected not just an isolated part of a project, but its overall completion. Courts often do not use formal CPM terminology, but simply an informal, CPM-like analysis to determine whether a contractor has met its burden of proof on that general requirement. *See id.*

MK's proposed instruction comprehensibly conveyed that requirement by explaining that GIT had to prove that

> [t]he delay was a "critical delay." A critical delay is one which would delay not just the particular activity at issue, but the overall completion date of the Work. Many activities may be performed on a project at any time without any effect on the completion of the project. A delay in such non-critical activities will not delay the project overall and cannot constitute an excusable delay. Only delays to activities on the critical path — activities with no leeway in the schedule — may give rise to excusable delay.

Contrary to GIT's suggestions, MK has not argued that GIT had to use, or that the court had to instruct the jury to use, formal CPM analysis. The term "critical path" was simply appropriate, though not necessary, jargon in a proposed

instruction that, as a whole, comprehensibly stated the general requirement that an excusable delay must "delay the project overall."

MK's proposed instruction thus accurately stated an applicable rule of law which the court's instructions did not expressly state. As a consequence, this court must determine whether the district court's instructions, taken as a whole, nonetheless "correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." *Allen v. Minnstar, Inc.*, 97 F.3d 1365, 1368 (10th Cir. 1996). We have stressed that the instructions "must be read and evaluated in their entirety." *United States v. Denny*, 939 F.2d 1449, 1454 (10th Cir. 1991). "'[N]o particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law.'" *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1424 (10th Cir. 1993) (quoting *Perrell v. FinanceAmerica Corp.*, 726 F.2d 654, 656 (10th Cir. 1984)).

2. *The Instructions as a Whole*

The court's instruction #22 enumerated six elements of a compensable delay, and then required GIT to prove that MK refused it the additional time to complete the project that a delay made necessary:

> GIT . . . must prove each of the following elements . . . :
> 1. GIT was delayed or accelerated in its performance;
> 2. The delay was beyond the control of GIT;
> 3. The delay was without the fault or negligence of GIT;

4. [MK's] conduct in causing the delay was not authorized by the subcontract;

5. GIT incurred additional costs as a direct result of the delay;[8] and

6. GIT complied with the written notice provisions of the subcontract [or proved an excuse for having failed to do so].

Before you may find that [MK] is liable to GIT under these elements for accelerating or delaying GIT's performance, GIT must prove that [MK] accelerated or delayed GIT's performance or

---

[8]The court's instruction #18, defining "excusable delays," cross-referenced instruction #22 and incorporated its list of the elements of a compensable delay. That is the list quoted in text. Elements 4–5 required GIT to show that the contract did not authorize MK to cause a delay, and that the delay caused GIT to incur costs. Those requirements are only relevant to whether a delay was *compensable*, i.e., could entitle GIT to recover damages. They are irrelevant to the distinct question whether a delay was *excusable*, i.e., could entitle GIT to an extension of time for purposes of determining if the termination was wrongful. *See generally* John Cibinic, Jr., & Ralph C. Nash, Jr., *Administration of Government Contracts* 543–618 (3d ed. 1995) (discussing excusable and compensable delays); Margaret M. Worthington & Louis P. Goldsman, *Contracting with the Federal Government* § 11–8, at 392–93 (4th ed. 1998). For a federal contractor to be entitled to an equitable adjustment to compensate for costs due to a delay, it must prove that the delay was unreasonable and was the government's fault. *See* Cibinic & Nash, *supra*, at 603. To obtain the lesser remedy of a time extension, however, the contractor need only prove that the delay was not foreseeable, within its own control, or due to its own fault. *See generally id.* at 543–52, 586–90, 603–07; *see also* Worthington & Goldsman, *supra*, § 11–8, at 393 ("Excusable delays entitle a contractor to an increased period of performance. However, only excusable delays that are caused by the government entitle the company to an equitable adjustment for increased cost due to the delay."). Delays that are neither the contractor's nor the government's fault, in other words, are excusable but not compensable. *See* Cibinic & Nash, *supra*, at 543. The MK-GIT subcontract contained a standard federal clause governing compensable delays. *See* 48 C.F.R. § 52.212–12; *see also* Cibinic & Nash, *supra*, at 586–87 (discussing clause). When the court incorporated its list of the elements of a compensable delay into its instruction defining excusable delays, it should have thus excluded elements #4–5. Its failure to do so, however, could only have prejudiced GIT, who has not challenged it on appeal.

required extra work of GIT, but refused to allow GIT the additional time necessary to complete the work.

As noted above, the court's instruction #18, defining "excusable delays," incorporated by reference the above part of instruction #22.

MK's proposed instruction began with a similar list of elements. It differed, though, in that it listed the critical-path requirement as its final element, while it did not refer to "additional time necessary to complete the work":

> In order to prove that a given delay . . . was excusable under GP 56B, GIT must prove . . . that:
>
> 1. The delay was unforeseeable.
>
> 2. The cause of the delay was beyond the control of GIT.
>
> 3. The cause of the delay was without the fault of GIT.
>
> 4. The cause of the delay was without the negligence of GIT.
>
> 5. GIT gave notice to [MK] of the cause of the delay within 10 days . . . .
>
> 6. The delay was a "critical delay." A critical delay is one which would delay not just the particular activity at issue, but the overall completion date of the Work. Many activities may be performed on a project at any time without any effect on the completion of the project. A delay in such non-critical activities will not delay the project overall and cannot constitute an excusable delay. Only delays to activities on the critical path — activities with no leeway in the schedule — may give rise to excusable delay.

After carefully comparing the court's instructions, taken as a whole, with MK's proposed instruction, taken as a whole, this court concludes that the district court's description of the law, while not faultless, was not reversibly erroneous. We rely primarily on the final paragraph of the court's instruction, which required GIT to prove that MK had delayed its performance, yet "refused to allow GIT the

additional time necessary to complete the work." If an otherwise-excusable delay did not affect the project's overall completion, the jury could have applied that paragraph, noted that no "additional time" was "necessary to complete the work," and thus concluded that GIT had not established an "excusable delay."

The court's and MK's definitions of excusable delay had similar structures. The court's "additional time" requirement and MK's criticality requirement occupied the same position at the end of that structure. Each followed a list of the basic elements of an excusable delay. In each instruction, those elements defined whether a delay was "excusable" in the common sense of the term, i.e., whether it was beyond GIT's control and not due to GIT's fault or negligence, and whether GIT promptly notified MK, so that the delay would not extend unnecessarily.[9] Each instruction proceeded to focus the jury on the conceptually distinct question whether the delay was relevant, i.e., whether it affected GIT's ability to timely complete the project as a whole.

MK's proposed instruction did so by specifying that a delay must "delay not just the particular activity at issue, but the overall completion date of the Work." The court's instruction did so by requiring the jury to find that MK had "refused

_____

[9]The court's list of six elements differed in minor ways from MK's list of five. The erroneous inclusion of elements of a compensable delay is discussed *supra* in note 8. The only other potentially significant difference is that the court's instruction did not require GIT to prove that a delay was unforeseeable. This was the first element in MK's instruction. While MK objected to this exclusion below, it has not done so on appeal.

to allow GIT the additional time necessary to complete the work." To find a delay excusable under MK's instruction, the jury had to find that it would delay "the overall completion date of the Work." Under the court's instruction, the jury had to conclude that a delay made "additional time necessary to complete the work." Each instruction thus required the jury to decide, first, whether GIT should be excused for a delay to a specific task and, second, whether that specific delay should excuse GIT from meeting the project's deadline.

Unlike the instructions given, MK's proposed instruction spelled out at some length, in the same terms as federal-contracting case law, the requirement that a delay affect overall completion. But this court's concern is not whether a district court's instructions are inferior to a proposed instruction. Our concern is to ensure that our review does not leave us with "substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations." *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1454 (10th Cir. 1997). These instructions do create some doubt whether the jury was properly guided, but that doubt is not sufficiently substantial to constitute error.

3. *Harmless-Error Review*

Even if a review of the instructions, read in isolation from the rest of the trial, did leave this court with a substantial doubt, it would then be necessary to determine whether any error prejudiced MK. *See Lusby v. T.G. & Y. Stores, Inc.*, 796 F.2d 1307, 1310 (10th Cir. 1986) ("Harmless error analysis normally applies

in civil cases . . . and it specifically applies to faulty jury instructions.") (citing 28 U.S.C. § 2111; Fed. R. Civ. P. 61). *See generally* 11 Charles Alan Wright et al., *Federal Practice & Procedure* § 2886 (2d ed. 1995). Instructional error requires reversal "'"only if the error is determined to have been prejudicial, based on a review of the record as a whole."'" *Shugart v. Central Rural Elec. Coop.*, 110 F.3d 1501, 1508 (10th Cir. 1997) (quoting *Wheeler v. John Deere Co.*, 862 F.2d 1404, 1411 (10th Cir. 1988) (quoting *Durflinger v. Artiles,* 727 F.2d 888, 895 (10th Cir. 1984))).

Unfortunately, the parties have offered no guidance to the over-3,000-page record of this complex, three-week trial. This court thus has no idea which parts of the record might bear on prejudice, and no sensible way to review "the record as a whole." That failure leaves us unable to determine whether the error, if any, prejudiced MK.

a. The standard for whether an instruction error was harmless

MK cites *Farrell v. Klein Tools, Inc.*, for the proposition that, if instructions are erroneous, this court must reverse unless we can say with "absolute certainty" that the error did not influence the jury. 866 F.2d 1294, 1301 (10th Cir. 1989). MK apparently reads *Farrell* to relieve it of any obligation to explain how an error may have prejudiced its substantial rights, or to identify any parts of the record that might show such prejudice.

*Farrell*, however, is inapposite.  It concerned not an instruction that misstated the law, but an instruction on a theory unsupported by sufficient evidence.  *See id.* at 1297–98.  The improper theory was an affirmative defense, and the jury returned a general verdict for defendant.  *See id.* at 1298.  On appeal, this court noted the general rule in such cases: if one of several issues submitted to a jury should not have been, a general verdict cannot stand.  *See id.* at 1299. After noting exceptions to the rule, we held that we were "bound, at least in this context, by our two most recent [general-verdict] cases, both of which strictly imposed the general rule."  *Id.* at 1299–1300  (following *McMurray v. Deere & Co.*, 858 F.2d 1436, 1444 (10th Cir. 1988) (not applying harmless-error review in case involving general verdict and affirmative defense unwarranted by evidence); *Smith v. FMC Corp.*, 754 F.2d 875, 876–77 (10th Cir. 1985) (same)).  We held that those precedents "leave[] no room for harmless error analysis."  *Id.* at 1300.

In this case, the court allegedly erred not by instructing on an unwarranted theory, but by misstating the law on a viable theory.  Harmless-error analysis does apply in such cases.[10]  When sufficient evidence supports each theory submitted to a jury, an error in stating the law that governs one of the theories may be

---

[10]*Farrell* does require this court to assume that the jury in this case relied on an excusable-delay theory unless we can say "with absolute certainty" that it did not.  866 F.2d at 1301.  That assumption, however, does not by itself compel reversal.  Even assuming the verdict did rely on findings of excusable delay, any error in defining such delays was harmless if the jury would have found the same delays excusable, and reached the same verdict, under correct instructions.

harmless.  *See, e.g.*, *Allen*, 97 F.3d at 1372–73; *Mehojah v. Drummond*, 56 F.3d 1213, 1215–16 (10th Cir. 1995).

MK also quotes an opinion saying that this court "'must reverse if the jury might have based its verdict on the erroneously given instruction.'" *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1202 (10th Cir. 1997) (quoting *City of Wichita, Kan. v. United States Gypsum Co.*, 72 F.3d 1491, 1495 (10th Cir. 1996)).  Three prior opinions also state that rule;[11] two specify that we must reverse "[e]ven if that possibility is 'very unlikely.'"  *City of Wichita*, 72 F.3d at 1495 (quoting *Adams-Arapahoe Jt. Sch. Dist. No. 28–J v. Continental Ins. Co.*, 891 F.2d 772, 780 (10th Cir. 1989) (quoting *Farrell*, 866 F.2d at 1301)).  An earlier opinion, however, sets a much less strict standard, requiring affirmance unless it is fifty percent likely that an error was prejudicial.  *See U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1253 n.39 (10th Cir. 1988) [*USI*] (in instruction-error case, noting circuit split on "standard of review . . . in gauging the effect of an error in a civil case" and adopting rule that error is harmless if appellant's "substantial rights . . . were more probably than not unaffected").

---

[11]*See City of Wichita*, 72 F.3d at 1495; *SEC v. Peters*, 978 F.2d 1162, 1167 (10th Cir. 1992); *Adams-Arapahoe Jt. Sch. Dist. No. 28–J v. Continental Ins. Co.*, 891 F.2d 772, 780 (10th Cir. 1989) (quoting *Farrell*, 866 F.2d at 1301).

This case does not require this court to reconcile those precedents. None says that harmless-error analysis does not apply.[12] They conflict on a substantive question: how likely must it be that an instructional error was prejudicial for this court to reverse? They do not concern the procedural question posed by this case: can this court determine the chance that an error was prejudicial if the parties provide no relevant appendix or arguments? Even assuming that a "very unlikely" chance compels reversal, our precedent setting that standard did not obviate the rules of appellate procedure.[13] Without a sufficient appendix, or any arguments citing the record, this court cannot determine whether the chance that an error prejudiced MK is fat, slim, or nil.

b.    The parties' obligations to provide an appendix and arguments

As appellant, MK was bound to "file an appendix [of record excerpts] sufficient for consideration and determination of the issues on appeal." 10th Cir.

---

[12]*See Coleman*, 108 F.3d at 1204–05; *City of Wichita*, 72 F.3d at 1495–96; *Peters*, 978 F.2d at 1167–68; *Adams-Arapahoe*, 891 F.2d at 778–80.

[13]No opinion in the *Adams-Arapahoe* line holds that, even if the parties offer no record or arguments regarding prejudice, this court will presume it. *See Coleman*, 108 F.3d at 1204–05; *Peters*, 978 F.2d at 1167–68; *Adams-Arapahoe*, 891 F.2d at 778. In *City of Wichita*, we did say that "[p]rejudice must be presumed in this case because we cannot ascertain to what extent" the instructions had kept appellant from proving its case. 72 F.3d at 1495. The panel did not specify, however, whether it was unable to ascertain prejudice because the arguments and record were indeterminate, or because the parties failed to provide any. This court will not assume that the case involved a failure to provide or cite a record, and thus created, *sub silentio*, a new rule that we must presume prejudice in cases lacking any record or argument on the issue.

R. 30.1.1[14]; *see also* 10th Cir. R. 10.1.1; Fed.R.App.P. 10(b)(1) & 30(a).  MK's appendix contains a few hundred pages of trial excerpts, but less than 10% of the entire 3,123-page transcript.[15]  GIT's supplemental appendix adds a few hundred more.

This court has held "on a number of occasions and in a variety of settings that the lack of a required transcript leaves us with no alternative but to affirm." *McGinnis v. Gustafson*, 978 F.2d 1199, 1201 (10th Cir. 1992).  An appellant's failure to provide a necessary transcript entails more than mere "noncompliance with some useful but nonessential procedural admonition"; it "raises an effective barrier to informed, substantive appellate review."  *Id.*  Such failures have kept this court from reviewing alleged instruction errors.  *See Dikeman v. National*

---

[14]After the parties had briefed this appeal, this court amended its rules, effective January 1, 1999.  Rule 30.1.1 is now slightly reworded and renumbered as Rule 30.1(A)(1).

[15]MK did ask the reporter to produce a complete trial transcript, which now resides in the district court as part of the "record on appeal."  *See* 10th Cir. R. 30.1.  Appellants, however, must provide materials "sufficient for consideration and determination of the issues on appeal" not only in the record on appeal, but in the appendix filed with this court.  10th Cir. R. 30.1.1 ("[I]nclusionary . . . requirements applicable to a record on appeal are equally applicable to appellant's appendix." (cross-referencing 10th Cir. R. 10.3 (noting "counsel's responsibility to see that the record on appeal is sufficient")));  *see United States v. Dean*, No. 93–3114, 1994 WL 43349, at *1 (10th Cir. Feb. 14, 1994) (declining to review issue because, while "[appellant] ordered the transcript, and the trial transcript was filed in the district court, [appellant] failed to include the entire trial transcript in his appendix to this court.").  Rule 30.1.1 made clear that MK was responsible for filing a sufficient appendix, and that this court was "under no obligation to remedy any failure."

*Educators, Inc.*, 81 F.3d 949, 955 (10th Cir. 1996); *King v. Unocal Corp.*, 58 F.3d 586, 587–88 (10th Cir. 1995). *King* began its analysis by stressing this court's duty to """"consider all the jury heard."""" 58 F.3d at 587 (quoting *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1365 (10th Cir. 1994) (quoting *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1549 (1993))). As a result, this court explained, "we must have a proper record before us" in order to review an alleged error in admitting or excluding a jury instruction. *Id.* In *Allen*, this court held in the alternative that an instruction had not been prejudicial, and that appellant's failure to provide a trial transcript left no option but to affirm:

> Although plaintiff speculates the verdict would have been different had the [challenged instruction] been different, we have no basis for reaching that conclusion without first reviewing the evidence that was admitted at trial. On the record presented, we are unable to conclude that plaintiff was prejudiced by the [assumed error in the instruction].

97 F.3d at 1372–73 (citing 10th Cir. R. 10.1.1).[16]

Precedent would thus justify affirmance based on MK's failure to provide a sufficient appendix. Even if this court ignored that failure and *sua sponte* obtained the 3,123-page transcript, we would then confront the parties' shared

---

[16]Judge Lucero wrote separately to disavow reliance on the latter ground, expressing concern that it suggested "that an appellant invariably carries a burden to disprove harmlessness" and thus "needlessly enter[ed] the much conflicted body of jurisprudence regarding burdens or presumptions in harmless error analysis in civil cases." *Allen*, 97 F.3d at 1374 (Lucero, J., concurring). This court discusses below our view that we may affirm based on the lack of record or arguments about prejudice without entering that conflict. *See infra* at 29–35.

failure to make arguments citing that transcript or even providing general guidance as to which parts of it might bear on the issue of prejudice. Each party on appeal must make arguments including "contentions and the reasons for them, with citations to the . . . parts of the record on which [it] relies." Fed. R. App. P. 28(a)(9) & (b). In this case, neither party has made any argument that might guide this court in reviewing the voluminous transcript, were we inclined to remedy MK's failure to provide it.[17]

Without citing the record, MK deems it "impossible to determine if the jury would have treated GIT's claims differently had the criticality requirement been imposed." Harmless-error analysis, however, requires this court to address not the unanswerable question whether the jury *would have* treated GIT's claims differently, but the eminently answerable question whether the jury *might have* treated GIT's claims differently. MK's failure to address that question is complete: it never argues that GIT's "excusable delays" did *not* in fact cause overall delay. Nor does it assert that it ever did so at trial, i.e., that it ever argued one of GIT's claimed delays was not "excusable" because the delay had not affected overall completion. It does claim that "issue[s] of delay and timely completion" were central to the trial, and argues that caselaw required GIT to

---

[17]GIT argues that any error in defining "excusable delay" was irrelevant, as it was not behind schedule at all. But GIT does not discuss or cite the record regarding the relevant question: assuming the jury *did* rely on findings of excusable delay, did any error in defining such delay prejudice MK?

show each individual delay caused an overall delay. But it never asserts a link between that legal argument and the outcome in this case: it says nothing inconsistent with an assumption that each delay claimed by GIT did in fact contribute to overall delay, and that any error in omitting the issue from the instructions was purely technical.

MK thus has not made a basic "contention" essential to any conclusion that the error prejudiced its substantial rights. Fed. R. App. P. 28(a)(9). Even were this court to infer from MK's brief a bare contention that some of GIT's claimed delays did not cause overall delay, the brief would still lack "reasons" for that implicit contention and "citations to the . . . parts of the record on which [it] relies." *Id*. MK's failure to provide a sufficient appendix, and both parties' failure to make arguments citing the record, leave this court only two alternatives: to speculate baselessly about prejudice, or to affirm.

    c.    It is unnecessary to decide whether either party bears a burden of persuasion regarding prejudice

In rejecting the path of speculation, this court need not enter the bog surrounding the issue whether appellants in civil cases bear a burden of persuasion on the issue of prejudice. *See Allen*, 97 F.3d at 1374–75 (Lucero, J., concurring). We do observe that an appellant must provide a sufficient record on appeal, and that both parties must make arguments which enable us to meaningfully review the record. To note those duties, however, is not to say that,

-29-

if the parties fulfill them, this court will then allocate to one party or the other an appellate burden of persuasion.[18]  This appeal turns not on any such rule, but on the answer to a simple, narrow question: if this court is unable, for whatever reasons, to determine whether an error was prejudicial or harmless, which party must lose?  In ordinary civil cases, we conclude, that party is the appellant.  To explain that holding's narrow compass, we must address the Supreme Court's recent discussion of burdens of persuasion in harmless-error review.

In *habeas* cases, the Court held, an appellate court must decide whether errors were harmless or prejudicial "'without benefit of such aids as presumptions or allocated burdens of proof that expedite fact-finding at the trial.'"  *O'Neal v. McAninch*, 513 U.S. 432, 436–37 (1995) (quoting Roger J. Traynor, *The Riddle of Harmless Error* 26 (1970)).  Part of *O'Neal*'s holding depends on concerns unique to *habeas* cases, but its rejection of the use of burdens in harmless-error review apparently does not.  *See id.* at 442 *(*"[E]ven if . . . we were to assume that the civil standard for judging harmlessness applies to *habeas* proceedings . . . it would make no difference.").

This court has not addressed whether *O'Neal* reversed our longstanding rule that appellants in ordinary civil cases bear the burden of showing that any errors

----

[18]Nor is it to suggest that an appellant's duty to make arguments citing the record is unilateral.  An appellee shares that duty.  *See* Fed. R. App. P. 28(b).  An appellee has no parallel duty to produce an appendix, but it may supplement the appellant's.  *See* 10th Cir. R. 30.2.

prejudiced their substantial rights. *See, e.g.*, *K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1156 (10th Cir. 1985); *Scritchfield v. Kennedy*, 103 F.2d 467, 474 (10th Cir. 1939). Nor does this case require that we do so. In *Scritchfield*, a 1939 instructional-error case, this court held that the original harmless-error statute imposed on appellants the burden of showing prejudice. *See* 103 F.2d at 474.[19] Four years later, the Supreme Court stated the same rule: "[the party] who seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted." *Palmer v. Hoffman*, 318 U.S. 109, 116 (1943). In seven opinions between 1958 and 1985, this court reiterated the rule of *Scritchfield* and *Palmer*.[20]

In 1986, however, a panel said, in *dictum*,[21] that "[i]n harmless error analysis the beneficiary of the error (usually the appellee) has the burden to show

---

[19]The original statute, 28 U.S.C. § 391, is "recodified with minor changes" by the current harmless-error statute, and is the "statutory source" of the civil harmless-error rule. *See O'Neal,* 513 U.S. at 441 (citing 28 U.S.C. § 2111 and Fed. R. Civ. P. 61).

[20]*See K-B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155–56 (10th Cir. 1985); *Neu v. Grant*, 548 F.2d 281, 286–87 (10th Cir. 1977); *Bonner v. Polacari*, 350 F.2d 493, 496 (10th Cir. 1965); *Vincent v. Young*, 324 F.2d 266, 269 (10th Cir. 1963); *Atlantic & Pac. Ins. Co. v. Combined Ins. Co. of Am.*, 312 F.2d 513, 515–16 (10th Cir. 1962); *Ahern v. Webb*, 268 F.2d 45, 46 (10th Cir. 1959); *Creekmore v. Crossno*, 259 F.2d 697, 698 (10th Cir. 1958).

[21]Appellant had not objected to an instruction, which the panel thus reviewed only for plain error. *See Lusby*, 796 F.2d at 1311–12. The quoted *dictum* was in a footnote comparing burdens of persuasion in plain-error and harmless-error analyses. *See id.* at 1312 n.4.

that the error almost surely did not affect the outcome." *Lusby*, 796 F.2d at 1312 n.4. The panel cited no authority for this proposition, which contradicted circuit and Supreme Court precedent. Its *dictum* would have been benign, though, had a 1992 panel not converted it to a holding. *See Board of County Comm'rs of San Juan County v. Liberty Group*, 965 F.2d 879, 884 (10th Cir. 1992) [*San Juan*] (applying rule that beneficiary of instruction error "has the burden of showing that the error 'almost surely did not affect the outcome'") (quoting *id.*)). *San Juan* relied solely on *Lusby*; it did not cite any valid authority or address the contrary precedent of this circuit and the Supreme Court. This court has not applied the rule since.

It is well-settled that "'when faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom.'" *Clymore v. United States*, 164 F.3d 569, 573 n.5 (10th Cir. 1999) (quoting *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996)). *Lusby*'s and *San Juan*'s comments assigning appellees the burden of establishing harmlessness are thus not good law. They had not, as of 1992, displaced the rule of *Scritchfield*.

This court need not answer the distinct question whether the 1995 *O'Neal* opinion did overrule *Scritchfield,* and thus relieve appellants of the burden of proving prejudice. Even assuming that *O'Neal* governs, we must affirm. *O'Neal* eliminates the use of a "burden of proof" to review prejudice, but it does not

eliminate an appellant's duty to provide an appendix, or the parties' shared duty to make arguments citing the record.

In rejecting the use of burdens or presumptions, the *O'Neal* Court stressed the need for thorough, conscientious record review, and suggested that invoking a "burden of proof" may short-cut that review. *See id.* at 435–37. It emphasized that cases of "virtual equipoise," in which a court may properly resort to a default rule, are rare. *Id.* at 435. It also quoted Justice Traynor's rejection of decisionmaking "aids":

> "Whether or not counsel are helpful, it is still the responsibility of the . . . court, once it concludes there was error, to determine whether the error affected the judgment. It must do so without benefit of such aids as presumptions or allocated burdens of proof that expedite fact-finding at the trial."

*Id.* at 437 (quoting Traynor, *supra*, at 26). *O'Neal* requires courts to review the record and reach a decision on prejudice whenever possible, instead of simply identifying some appeals as "close cases" and invoking a "burden of proof" to resolve them.

*O'Neal* thus makes it even more crucial that appellants provide sufficient appendices, and both parties make arguments supported by sufficient citations to enable meaningful review. This court has repeatedly declined to "sift through" entire records to find support for arguments devoid of citations. *See, e.g., United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1237–38 n.8 (10th Cir. 1997); *Harold's Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1540 n.3 (10th

-33-

Cir. 1996). By eschewing the shortcut of a "burden of proof," *O'Neal* only increases this court's need for sufficient guidance from parties to enable us to review voluminous records intelligently, rather than sift through them aimlessly.[22]

If the appendices and arguments leave this court unable to determine whether an error was prejudicial, we must resolve the appeal by invoking a default rule imposing the risk of equipoise on one party. To do so is not to impose a "burden of proof" on that party, and is fully consistent with *O'Neal*. That opinion governs cases in which a court truly cannot decide if an error was harmless and must resort to a default rule. *See id.* at 435, 437. While the Court intended to narrow that class of cases by rejecting the use of "burdens of proof," it recognized that such cases will still arise. When they arise in the *habeas* context, *O'Neal* holds, the error must be deemed prejudicial. *Id.* at 436. While eliminating any "burden of proof," *O'Neal* thus did not shrink from "placing the risk of doubt" on one party. *Id.* at 439.

To do so was not optional. If a court must resolve each appeal, and cannot do so by flipping coins, then it must place the "risk of doubt" on one party or the other. That risk becomes relevant if the court cannot ascertain whether an error was harmless. It may be unable to do so because, as envisioned in *O'Neal*, the

---

[22]In the passage quoted in *O'Neal,* Justice Traynor did refer to a court's responsibility to determine prejudice "whether or not counsel are helpful." *See* Traynor, *supra*, at 26 (quoted at 513 U.S. at 437). *O'Neal*, however, did not involve a lack of record or arguments on the issue of prejudice, and the Court's point in quoting Justice Traynor was not to address such a case.

parties provide an adequate record and arguments, but the court's review leaves it in "virtual equipoise." Or the court may be unable to do so because, as here, the parties' failure to provide such material prevents it from commencing any review.

*O'Neal* assigned the risk of doubt in *habeas* appeals to the State, noting the writ's purpose and the uniquely uneven stakes in those nominally civil cases. *See id.* at 442–43. If *O'Neal* applies to non-*habeas* cases, this court concludes, the risk of doubt must rest with the appellant. That rule accords with the appellant's responsibility for the appendix, and its status as the party seeking to change the status quo. More importantly, it preserves that part of our longstanding *Scritchfield* rule which is not inconsistent with *O'Neal*. The *O'Neal* Court rejected the use of decisionmaking shortcuts like a burden of proof, but acknowledged the need to place the risk of doubt on one party. Our *Scritchfield* rule, meanwhile, has two components: it uses a burden of proof, and it puts the risk of doubt on appellants. Only the first is inconsistent with *O'Neal*.

Accordingly, even if the instructions were erroneous, MK's failure to provide a sufficient appendix, and the parties' failure to make arguments affording any guidance to the voluminous record, would require us to affirm.

C.   Damages

MK challenges the sufficiency of the evidence of GIT's claimed damages in general, and of three specific categories of damages: attorney's fees, equitable adjustments, and claims on behalf of subs. It also argues that the contract barred

GIT as a matter of law from asserting the latter claims without having first settled with and paid its subs.

   1.   *Sufficiency of GIT's Evidence of Damages*

MK makes two overlapping challenges to GIT's damage evidence. The first is that GIT ignored the contract provision detailing the damages to which it was entitled, and that the court allowed it instead to submit evidence supporting "a common-law measure of damages." The second is that GIT did not offer sufficient evidence of a "causal connection" between MK's acts and the majority of the damages GIT claimed in the exhibits submitted to the jury.

As noted above, the contract required the court to determine all substantive legal issues in accord with the body of government-procurement law. In addition, GP 55H, part of the contract's termination-for-convenience clause, provides that "[t]he cost principles and procedures of FAR, Part 31 . . . shall govern all costs claimed, agreed to, or determined under this article." Under those principles, as interpreted in the decisions of the federal courts and boards of contract appeals which handle most federal-contracting disputes, GIT bore the burden of proving damages in accord with the contract "'with sufficient certainty so that the determination of the amount of damages will be more than mere speculation.'" *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed. Cir. 1987) (quoting *Willems Indus. v. United States*, 295 F.2d 822, 831 (Ct. Cl. 1961)). MK was not obliged to present evidence attacking items of damages if GIT had not

made a *prima facie* showing that the items were properly included in its claim. *See id.* In addition, FAR part 31 required GIT to prove that incurred costs were "reasonable." *See* 48 C.F.R. §§ 31.105(a)–(b), .201–3, .204(a).

For purposes of analysis, it is appropriate to divide GIT's total claim of roughly $11.35 million into equitable adjustments ($3 million), lower-tier subcontractor claims ($3.7 million), attorney's fees ($1.35 million), unpaid contract work and post-termination equipment expenses and work ($1.9 million),[23] and other ($1.4 million). (All figures include overhead, profit, and bond.) As detailed below, GIT offered no admissible evidence whatsoever to support its claim of roughly $1.35 million for attorney's fees.[24] GIT also did not offer sufficient evidence to support its claims for roughly $3 million in equitable adjustments to the contract. Nor did it offer sufficient evidence of most if not all of the roughly $3.7 million in damages it claimed on behalf of its subs.[25]

---

[23]The $1.9 million total includes roughly $615,000 for "GIT-owned equipment directed [to be] left on-site and [later] used by MK[]." GIT also claimed roughly $275,000 for "GIT Equipment Standby: Off-Site." The parties do not discuss, and the record on appeal does not reveal, whether the latter claim was part of GIT's equitable adjustments or its claims for post-termination equipment-related expenses, to which MK has not strenuously objected. Because this court must order a new trial, we need not resolve that uncertainty.

[24]This amount includes profit, overhead, and bond. If on remand GIT substantiates its claim for attorney's fees, MK remains free to contest the propriety of awarding GIT profit, or overhead at a rate presumably applicable to construction activities, on that claim.

[25]This court's conclusion that the contract barred GIT from asserting its
(continued...)

a.    GIT's evidence was not based only on a common-law damages theory

MK's broader argument is that GIT premised all of its damage evidence on a common-law theory of damages fundamentally inconsistent with the contract and the FAR.  MK acknowledges that the district court rejected GIT's common-law theory and properly instructed the jury to award damages in accord with the contract.  MK argues, however, that the court nonetheless admitted evidence inconsistent with the contract and did not require evidence consistent with it.  MK is incorrect.  GIT did seek a common-law measure of damages rather than the damages provided by the contract.[26]  It did so, however, as part of its claim that the termination had been not merely wrongful but in bad faith.  If GIT had proved bad faith, it could have recovered full common-law damages for breach of

_____

[25](...continued)
subs' claims without having first settled those claims makes it unnecessary to address MK's argument that the evidence supporting the claims was insufficient. MK does not specifically challenge the sufficiency of the evidence supporting GIT's claimed damages, totaling roughly $1.9 million, for work performed under the contract for which MK withheld payment; for work MK required it to perform after the termination; and for equipment MK required it to leave on site after the termination. GIT's insufficient evidence of its claimed attorney's fees and equitable adjustments, and the impropriety as a matter of law of its unsettled subcontractor claims, jointly require a new trial. This court thus need not determine whether GIT offered sufficient evidence of its other claimed damages.

[26]There is one major difference between common-law damages for breach of contract and termination-for-convenience damages in federal contracting law. Common-law damages may include anticipated profits on work that a contractor was to perform under the terminated part of a contract. Convenience-termination damages under federal-contracting law may not. *See, e.g.*, *Rhen v. United States*, 17 Cl. Ct. 140, 143 (1989); *William Green Constr. Co. v. United States*, 477 F.2d 930, 936 (Ct. Cl. 1973). *See generally* Cibinic & Nash, *supra,* at 692–93.

contract. *See Apex Int'l Mgmt. Servs., Inc.*, ASBCA No. 38087, 94–2 B.C.A. (CCH) ¶ 26,842, at 133,550, 1994 WL 117148 (1994); *see also* Section of Public Contract Law, American Bar Association, *Government Contract Law: The Deskbook for Procurement Professionals* 325 (1995) [hereinafter *Gov't Contract Deskbook*]. The court, however, declined to submit the bad-faith claim to the jury. It ultimately required GIT to delete anticipated profits from its claim, and it instructed the jury on damages recoverable under the termination-for-convenience clause. MK identifies several other allegedly improper damage items, but, with one minor, arguable exception,[27] no actually improper item went to the jury.

    b.    GIT did not present sufficient evidence of the causation and reasonableness of at least two of its categories of claimed damages

MK frames its second sufficiency-of-the-evidence argument in terms of the common-law requirement of "causation for breach of contract damages." Under the contract, however, and the federal contracting law that it incorporates, GIT

---

[27]The exception is GIT's claim of roughly $7,000 for "weather delay damages." (Robinson's pass-through claim also apparently included such damages.) The contract plainly forbids any award of costs, as opposed to extensions of time, for delays caused by weather.

The issue, however, is not as straightforward as it might seem. The record on appeal suggests that GIT did not simply argue that weather had delayed its work, and MK should pay for its resultant costs. Rather, GIT argued that MK had been unduly cautious, or relied on defective sensing equipment, in requiring GIT to stop work on numerous occasions because of lightning. GIT apparently sought compensation for costs due to such stoppages. The parties have not briefed or provided a complete record on this issue. This court thus leaves for remand the question whether GIT may recover damages caused by MK's inaccurate measurement of, or unreasonable response to, severe weather.

did not have to prove an entitlement to common-law breach-of-contract damages. It had to prove an entitlement to equitable adjustments to the contract price.[28] *See generally* Cibinic & Nash, *supra,* at 430, 671, 692 (explaining primacy of equitable-adjustment analysis (citing, e.g., *Johnson & Son Erectors*, ASBCA No. 24564, 81–1 B.C.A. (CCH) ¶ 15,082, at 74,599, 1981 WL 7060 (1981), *aff'd*, 231 Ct. Cl. 753, 1982 WL 1441 (1982))).

An equitable adjustment is a change in contract price. It compensates a contractor for increased costs reasonably incurred because the government (or, in this case, MK) increased the amount or difficulty of work required by the contract, or delayed or accelerated that work. *See id.* at 669–73 (citing, e.g., *Modern Foods, Inc.*, ASBCA No. 2090, 57–1 B.C.A. (CCH) ¶ 1229, at 3544, 1957 WL 4960 (1957); *Celesco Indus., Inc.*, ASBCA No. 22251, 79–1 B.C.A. (CCH) ¶ 13,604, at 66,683, 1978 WL 2148 (1978) (describing equitable adjustment as "the difference between the reasonable cost of performing without the change . . . and the reasonable cost of performing with the change")). Some equitable adjustments are for work added by formal change orders. The contract included a standard clause allowing such orders.[29] Other equitable adjustments result from

---

[28]The parties do not seem to dispute GIT's right to damages for work that the contract required, and that GIT performed, but for which MK did not pay.

[29]The contract contained the standard federal Changes clause for fixed-price construction contracts. *See* 48 C.F.R. (FAR) § 52.243–4. The clause provides that MK may, "by written order designated . . . a change order, make changes in

(continued...)

"constructive changes," which occur when the government does something to increase a contractor's costs without issuing a formal change order. *See id.* at 381, 399, 408–09, 429–35; *see also* 48 C.F.R. § 52.243–4(b), (d).

If a contractor thinks that the government has caused a constructive change, it must ask the government to equitably adjust the contract. The contractor must show either its estimated costs, if it requests the adjustment before doing the additional work, or its incurred costs, if it requests the adjustment after having completed the work. *See* Cibinic & Nash, *supra*, at 669–71. The contractor may convince the officer administering the contract to adjust the contract during performance. If not, it must convince an adjudicator to award an adjustment after the contract is completed or terminated. *See id.*

To prove that it is entitled to an equitable adjustment, a contractor must show liability, causation, and injury. *See Wunderlich Contracting Co. v. United States*, 351 F.2d 956, 968 (Ct. Cl. 1965). It must prove that the government somehow delayed, accelerated, augmented, or complicated the work, and thereby caused the contractor to incur specific additional costs. *See id.* at 969. *See generally* Cibinic & Nash, *supra,* at 429–35, 697–702. The contractor must not

---

[29](...continued)
the work within the general scope of the Subcontract"; that "[a]ny other written or oral order . . . from [MK] that causes a change shall be treated as a change order" upon written notice by GIT; and that "[i]f any change under this article causes an increase or decrease in [GIT]'s cost of . . . performance . . . [MK] shall make an equitable adjustment and modify the Subcontract in writing."

only prove that the government specifically caused its increased costs, but must prove that those costs were reasonable, allowable, and allocable to the contract. *See, e.g.*, *McDonnell Douglas Corp. v. United States*, 40 Fed.Cl. 529, 536 (1998) (citing 48 C.F.R. (FAR) §§ 31.201–1 to 201–4 (requiring and defining allowability, reasonableness, and allocability)). *See generally* Cibinic & Nash, *supra*, at 697–702. The contractor bears the burden of proof on all of those factors. *See McDonnell Douglas*, 40 Fed.Cl. at 536; *see also Lisbon Contractors*, 828 F.2d at 767.[30]

GIT presented very little or no evidence of how MK's actions specifically caused GIT to incur the costs claimed in its damage exhibits. Nor did it present evidence that those costs were reasonable.[31]

---

[30]Until recently, the courts and boards of contract appeals that adjudicate most federal-contract disputes applied a presumption that a contractor's incurred costs were reasonable. The government bore the burden of proving that incurred costs were unreasonable. *See, e.g.*, *Neal & Co. v. United States*, 19 Cl.Ct. 463, 470 (1990) (citing *Bruce Constr. Corp. v. United States*, 324 F.2d 516 (1963)). *See generally* Worthington & Goldsman, *supra*, § 7–4, at 147–48. In 1987, though, the FAR was amended to state that "[n]o presumption of reasonableness shall be attached to the incurrence of costs by a contractor." 48 C.F.R. (FAR) § 31.201–3, as amended by 52 Fed.Reg. 19,804 (1987); *see, e.g.*, *Herman B. Taylor Constr. Co. v. General Servs. Admin.*, GSBCA No. 12915, 96–2 B.C.A. (CCH) ¶ 28,547, at 142,529–30, 1996 WL 498543 (1996) ("With the revision of FAR 31.201-3 . . . the burden of proof to establish the reasonableness of the incurred cost is placed on the contractor."); Worthington & Goldsman, *supra*, §7-4, at 148. GP 55H of the MK-GIT contract incorporates FAR § 31.201–3.

[31]MK also argues that GIT improperly based its damage calculation entirely on budget overruns, i.e., costs incurred in excess of GIT's internal budget. GIT unilaterally created that budget after the contract award. MK argues that GIT's

(continued...)

i.  *Attorney's fees*

The court erred in submitting GIT's $1.35 million claim for outside attorneys' and consultants' fees ("attorney's fees") to the jury.  GIT presented no admissible evidence whatsoever of such fees.  The court apparently made a simple error of omission at the end of this long, complex trial.  During the trial, as detailed below, the court properly ordered GIT to remove the claim for attorney's fees from its damage exhibit.  Despite MK's prompting, however, the court ultimately failed to require GIT to do so.  On appeal, MK has demonstrated GIT's complete failure to document its attorney's fees.  GIT has not meaningfully contested that failure.

GIT's final damage exhibit claimed roughly $1.55 million for "equitable adjustment costs to date."  Kip Cooper, GIT's damage witness, testified that roughly $450,000 thereof was for time spent by GIT employees to prepare GIT's claim.  The rest was for the fees of "outside consultants and attorneys."  With overhead, profit, and bond, that amount totaled roughly $1.35 million.

---

[31](...continued)
reliance on such overruns made its entire damage claim improper as a matter of law.  But MK has not rebutted GIT's assertions that it based only a few of its equitable-adjustment claims on costs in excess of its internal budget.  MK cites only *dictum* from one board-of-contract-appeals opinion to support its assertion that use of such budget figures makes a damage claim invalid as a matter of law.  *See Bruce-Andersen Co.*, ASBCA No. 31663, 89–3 B.C.A. (CCH) ¶ 22,013, at 110,729–30, 1989 WL 74316 (1989) (criticizing contractor's use of "after-the-fact budget figure" exceeding figure from bid, after noting that appeal only concerned entitlement to adjustment, not amount thereof).

MK objected that GIT had introduced no evidence of the fees, i.e., invoices from the outside attorneys. Both Cooper and GIT's counsel promptly conceded that the invoices were not in evidence. The court declined to let Cooper testify as to the amount incurred, observing that attorney's fees "have to be proved like any other item of damage. It requires some more proof than this man saying that's what was paid." The court further noted that if, indeed, none of GIT's evidence substantiated its claimed fees, then the fees "will be deleted from that exhibit and from your claim. . . . I'm not going to let you claim specific expenditures that were not supported in the documents." GIT accepted this ruling without protest.

Soon thereafter, GIT tried to introduce the invoices into evidence. The court asked why GIT had not provided them until mid-trial. "We had to go out there and just collect them up," GIT's counsel replied. The court ruled that "[i]f it hasn't been disclosed until the middle of trial, it can't be used. I don't hear anything from you that would justify [GIT's] late action." GIT accepted this ruling without protest.

GIT later eliminated its claims for anticipated profits and prejudgment interest from its damage exhibit, pursuant to the court's rulings on those issues. But GIT did not reduce its claim for "equitable adjustment costs" to eliminate the disallowed attorney's fees.

During the jury-instruction conference the next day, MK moved to exclude the fee claim. MK noted that the court had not admitted any evidence of the fees.

The court recalled having "excluded something" and asked GIT what it was. This provoked a confused exchange.[32] GIT's counsel forthrightly acknowledged that it was "the outside claim preparation costs for attorneys" that the court had excluded. MK, however, then made an additional argument, which apparently distracted the court. The court then misspoke, saying, "I'm not going to exclude the claim for attorneys' fees. . . . [J]ust the claim for attorneys' fees is supported apparently in admitted documents . . . ."

---

[32]The entire exchange was as follows:

MK: The damage claim has a component named in it for attorney's fees. No evidence of attorneys' fees was allowed to come in yesterday.

COURT: Well, this was discussed this morning with respect to instructions and I knew I had excluded something. I didn't know if it was everything or not. Is it, Mr. Schooley [GIT's counsel]?

GIT: I think it was just the outside claim preparation costs for attorneys. The internal costs of GIT with regard to claim preparation costs were not excluded.

COURT: And they are in these boxes of damage documents?

GIT: The internal costs were in the boxes of the damages, Your Honor.

MK: Well, and my motion goes beyond that, however. We will present evidence . . . that attorneys' fees are part of the overhead that was assigned to each claim. There was an overhead component assigned to each one of these claims and my understanding is that attorneys' fees are a part of that overhead too.

COURT: Well, I'm not going to exclude the claim for attorneys' fees. It's up to you to establish if there's some double recovery sought but just the claim for attorneys' fees is supported apparently in admitted documents and that motion is overruled.

MK next moved for judgment as a matter of law (JMOL) under Rule 50(a). The motion reminded the court of its refusal to admit the invoices into evidence and asked it to instruct the jury that there was insufficient evidence to support an award of fees. The court orally denied the motion without analysis or comment.

MK has summarized the parts of the record revealing the court's failure to enforce its order to exclude the attorney's-fee claim. GIT *never* objected to that order. In reply, GIT has not pointed to any contradictory passage in the record.[33]

GIT's main argument on appeal is that MK waived the issue by failing to raise it in a post-verdict Rule 50(b) motion for JMOL, despite having raised it in a pre-verdict Rule 50(a) motion. GIT is wrong. MK's failure to renew the attorney's-fees issue in its Rule 50(b) motion does preclude this court on appeal from ordering the entry of judgment in MK's favor on that issue. *See Cone v. West Va. Pulp & Paper Co.*, 330 U.S. 212, 217–18 (1947); *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1334 (10th Cir. 1984); *Hansen v. Vidal*, 237 F.2d 453, 454 (10th Cir. 1956). Under Tenth Circuit precedent, however, that failure

---

[33]GIT argues that MK failed to question the fees' reasonableness when they were first mentioned, failed to present evidence challenging their reasonableness, and "never attempted to demonstrate what [MK] believed constituted a reasonable fee." These starkly inadequate arguments all ignore the fundamental point that it was GIT's burden to prove the amount and reasonableness of its fees, and that MK objected consistently, successfully, and without protest to GIT's failure to timely introduce any evidence to document those fees. *See, e.g.*, *Sheets v. Salt Lake County*, 45 F.3d 1383, 1391 (10th Cir. 1995) (assigning to party claiming attorney's fees the burden of documenting their extent and reasonableness "with meticulous and contemporaneous time records" (citing *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir. 1986))).

does not bar MK from appealing the issue of the sufficiency of the evidence to support the attorney's-fees claim. *See Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1385 (10th Cir. 1989); *see also Orman v. Standard Constr. & Remodeling Co.*, No. 92–6323, 1993 WL 262599, at *1 & n.1 (10th Cir. July 8, 1993) (unpublished disposition) (specifying that failure to move for JMOL under Rule 50(a) precludes review of sufficiency of evidence, but that only effect of failure to renew motion under Rule 50(b) is to limit relief to new trial).[34]

ii.   *Equitable adjustments*

This court further concludes that GIT did not present sufficient evidence to support its claims for roughly $3 million in equitable adjustments. MK has demonstrated on appeal that GIT presented virtually no evidence to show how MK's misdeeds or omissions caused the *specific* costs which GIT claimed as equitable adjustments. Nor did GIT make any showing that those costs were reasonable and allowable.

GIT summarized its damage claims in several tables. It supported these tables with six boxes of invoices, petty cash records, canceled checks, payroll

---

[34]As GIT notes, the Second Circuit takes a contrary view. That Circuit holds that a party waives its right to appeal the sufficiency of evidence, absent "manifest injustice," if it challenges that sufficiency in a pre-verdict Rule 50(a) motion but fails to renew the challenge in a post-verdict Rule 50(b) motion. *See Norton v. Sam's Club*, 145 F.3d 114, 118 & n.2 (2d Cir. 1998) (discussing *Varda, Inc. v. Insurance Co. of N. Am.*, 45 F.3d 634, 638 (2d Cir. 1995)). This panel need not consider the merits of that approach, as it is without power to overrule the unequivocally contrary precedent of this Circuit.

records, and the like. GIT's final master damage summary, which is substantially reproduced in the margin,[35] listed eight "equitable adjustment" claims, which totaled roughly $3 million. It also included a ninth claim, for "Extra Compensation: Wrongful Termination Damages," of roughly $4.7 million. GIT submitted a second-level breakdown for each of its nine claims. The breakdowns divided each claim into two to nine items.

GIT's lone damage witness, Kip Cooper, directed GIT's accounting department and oversaw the company's financing. His main function as a witness was to sponsor GIT's damage exhibits. He very briefly explained what each of the nine breakdowns comprised, and how the summary related to the breakdowns.

35

| Ref. No. | Claim Description | Damages |
|---|---|---|
| 1 | Equitable Adjustment: Excess GIT Management Damages | $373,682.28 |
| 2 | Equitable Adjustment: Interference Damages | $636,829.78 |
| 3 | Equitable Adjustment: SCN–006 Asbestos Debris | $1,032.89 |
| 4 | Extra Compensation Claim: Wrongful-Termination Damages | $4,730,407.31 |
| 5 | Equitable Adjustment: Weather Delay Damages | $7,221.38 |
| 6 | Equitable Adjustment: North Continent Impact Damages | $1,143,175.21 |
| 7 | Equitable Adjustment: Breach of Contract Damages | $164,004.00 |
| 8 | Equitable Adjustment: Quantity Variation Damages | $376,038.18 |
| 9 | Equitable Adjustment: Permit Impact Damages | $270,948.55 |
| | **GIT's Subtotal "A":** | **$7,703,339.58** |

The rest of the master summary listed each sub's total damages, tallied them as "Subtotal 'B,'" which was $3,660.886.78, and added the subtotals to yield "GIT's Total Damages to Date" of $11,364,226.36.

-48-

He also summarized the types of supporting documents for each category of damages, and laid a foundation for the documentation's admission into evidence by testifying that GIT had created the records in the ordinary course of business.

Cross-examination established that Cooper had not been directly involved in deciding to allocate to the project the costs assembled in the six boxes of documentation. Nor had Cooper been involved in evaluating how MK had caused GIT to incur those costs, or whether they were reasonable. GIT personnel on site in Colorado, rather than in the Pennsylvania office where Cooper works, had apparently made those decisions. Cooper said at one point, "I cannot tell you what was going through their heads out there at the site, why this was charged to the project." And later, in discussing an item challenged by MK, he said, "I'm here to tell you it's a direct job cost. I don't know the reasoning behind it."

GIT thus presented only one witness to support a roughly $3 million claim for eight equitable adjustments, and that witness lacked direct knowledge of the project. He did not know, in particular, how MK's alleged errors and omissions might have caused GIT to incur increased costs not contemplated in the contract. Beyond Cooper's foundational testimony, GIT presented only a damage summary, a two- to nine-item breakdown for each equitable adjustment, and six banker's boxes of time sheets, checks, cash logs, invoices, and similar raw material. It simply did not make any showing of how MK, by delaying or complicating or increasing the work required by the contract, caused GIT to incur specific costs.

-49-

Nor did it show why those costs were reasonable. GIT has not met its burden of presenting "specific, persuasive evidence or analysis demonstrating how any government action . . . caused [its] overruns." *Hoffman Constr. Co. of Ore. v. United States*, 40 Fed.Cl. 184, 201 (Fed.Cl. 1998), *aff'd in relevant part*, No. 98–5075, 1999 WL 37411, at *1 (Fed.Cir. Jan. 22, 1999). "A contractor must present more than general, unsubstantiated pronouncements from its own witnesses that various acts of the government caused . . . overruns." *Id.* (citing *Luria Bros. & Co. v. United States*, 369 F.2d 701, 713 (Ct. Cl. 1966)).

GIT's attempt to rebut MK's argument on appeal is inadequate. GIT notes MK's "repeated admissions" of its "failure to pay GIT for the contract work and extra work." GIT cites parts of the record that evince MK's refusal to pay GIT for some completed work under the contract and for some additional work that MK ordered after it had terminated GIT. The evidence to which GIT points, however, establishes at most that MK caused GIT *some* damages by refusing to pay it for completed contract work and some post-termination work. Unpaid contract work and unpaid post-termination work, however, comprised only about $1.25 million of GIT's total claim of over $11 million. MK's failure to pay GIT for some of its work under the contract has nothing to do with whether MK caused GIT to incur roughly $3 million in additional costs unanticipated by the contract but recoverable as equitable adjustments. MK allegedly caused GIT to incur those costs not by refusing to pay it for work, but by delaying the work or

-50-

misinterpreting the specifications. Similarly, MK's refusal to pay GIT for completed work has nothing to do with whether GIT proved that the additional costs for which GIT claimed equitable adjustments were reasonable.

GIT repeats its error in attacking another of MK's arguments. MK asserts that some of GIT's increased costs were due to mistakes made by GIT and its subs, for which MK was not responsible. GIT responds that MK "simply ignores the overwhelming evidence demonstrating that MK knowingly failed to pay GIT." But again, this court may assume that GIT suffered some damages because MK refused to pay for completed work. That does not mean that the additional costs for which GIT sought equitable adjustments were not in part caused by GIT itself, or by its subs.[36]

2.   *The Contract Did Not Allow GIT to Recover on Behalf of Its Subs Without Having First Settled Their Claims*

The contract allowed MK to terminate GIT either for convenience or default. If MK terminated GIT for default and a court found the termination wrongful, then the termination would convert to one for convenience. GP 55, the standard termination-for-convenience clause for fixed-price construction

---

[36]GIT also claims that MK admitted a liability of at least $7 million when it "reported to the DOE [Department of Energy] that . . . GIT was entitled to recover [$7,115,381]." GIT cites only a document that MK apparently created for DOE, titled "Estimated Termination Costs if [MK's] Contract is Terminated [by DOE]." The document does list $7,115,381 under "Lawsuit Liabilities." A comment reads, "Dollars value from GIT letter, to DOE Contracting Office." MK did not thereby admit its liability to GIT. MK simply told DOE about GIT's own valuation of its claim, as an estimate of MK's *potential* liability.

-51-

contracts, established MK's and GIT's duties after such a termination. *See* 48 C.F.R. § 52.249–2. The clause obliged GIT to terminate its subcontracts, entertain termination-settlement proposals from its subs, and settle their claims. GIT would then make its own termination-settlement proposal to MK, and they would negotiate a settlement. GIT's proposal to MK would presumably include the costs it had incurred in settling and paying its subs' claims.

Because MK terminated GIT for default, however, the parties did not follow that procedure. GIT never settled with or paid three of its four subs. GP 55F(1) set forth MK's obligations if it terminated GIT for convenience but then could not reach a settlement with GIT. Among scenarios contemplated by the contract, that is the closest analogue to what occurred. For work performed before termination, GP 55F(1) obliged MK to pay GIT "(a) [t]he cost of this work; [and] (b) [t]he cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the [contract] if not included in subparagraph F(1)(a) above." MK argues that GP 55F(1)(b) bars GIT from recovering on its subs' claims unless it has "settled and paid" those claims.[37]

---

[37]In its pre- and post-verdict motions for JMOL, MK objected to the subs' claims on sufficiency-of-the-evidence grounds, but did not claim that GP 55F(1)(b) barred the claims as a matter of law. GIT asserts that this failure precludes MK from so arguing on appeal. It does not. MK made its argument in the jury-instruction conference, proposed a special-verdict form reflecting its view, and objected to the court's rejection thereof. Whether the contract bars the

(continued...)

Two decisions by the Armed Services Board of Contract Appeals hold that contract provisions like that at issue here require settlement. One says that, "[a]bsent either actual payment or binding settlement agreements, the vendors' termination claims are not allowable in the termination settlement." *Murdock Mach. & Eng. Co. of Utah*, ASBCA No. 42891, 93–1 B.C.A. (CCH) ¶ 25,329, at 126,195, 1992 WL 206519 (1992), *aff'd in relevant part sub nom. Dalton v. Murdock Mach. & Eng. Co. of Utah*, No. 93–1440, 1994 WL 51573, at *1 (Fed. Cir. Feb. 22, 1994) (unpublished disposition). The other quotes a predecessor of the clause at issue here and reads it to require either payment or settlement:

> [T]he Termination for Convenience clause . . . permits recovery by appellant of "the cost of settling and paying claims arising out of the termination of work under subcontracts or orders . . . ." In the absence of any evidence that appellant either settled or paid the claims of the two subcontractors, we deny the proposed amount representing settlement with the subcontractors in its entirety.

*Atlantic, Gulf & Pac. Co. of Manila*, ASBCA No. 13533, 72–1 B.C.A. (CCH) ¶ 9415, at 43,745, 1972 WL 1390 (1972).

---

[37](...continued)
subs' unsettled claims is a question of law, not of the sufficiency of evidence. MK thus did not have to raise it in a motion for JMOL to preserve it for appeal; its objections to the verdict form suffice. *See Ruyle v. Continental Oil Co.*, 44 F.3d 837, 841 (10th Cir. 1994) ("A party who properly raises an issue of law before the case goes to the jury 'need not include the issue in a motion for [JMOL] in order to preserve the question on appeal.'" (quoting *Landes Constr. Co. v. Royal Bank of Can.,* 833 F.2d 1365, 1370 (9th Cir. 1987)); *Cleveland v. Piper Aircraft Corp.*, 890 F.2d 1440, 1456 (10th Cir. 1989) (holding that proposal of special-verdict form, and objection to form used by court, preserved for appeal any errors in form to which party had objected, "even though such asserted errors were not made the bases of a motion for [JMOL]").

A recent Court of Federal Claims opinion necessarily implies that a contractor who seeks to recover on its subs' claims must have settled, but need not have paid, those claims. *See McDonnell Douglas*, 40 Fed.Cl. at 555 & n.18. The court approvingly quoted part of the Government's brief. The passage described unsettled subcontractor claims as non-incurred, contingent costs, which the FAR disallows:

> "The Government challenges plaintiffs' claim for approximately $26 million in contingent costs not yet incurred. These contingent costs are primarily for program security costs, settlement expenses, and *settlement with remaining subcontractors*. These costs are unallowable. 'Pursuant to FAR [§] 52.249-2. Termination for Convenience of the Government (Fixed-Price) the contractor may recover costs *incurred* in the performance of the work.' *Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, 112 (1992) (emphasis added). Moreover, cost principles expressly prohibit, in FAR Part 31, recovery of non-incurred, contingent costs. *See* FAR [§] 31.205–7(a) and 7(b)."

*Id.* at 555 n.18 (first emphasis added). This part of the opinion, titled "Yet To Be Incurred Costs," went on to note that "McDonnell Douglas has reached a settlement with [one sub] since the time of trial. Thus, $5 million [the amount of the settlement] is no longer a cost yet to be incurred." *Id.* at 555. The court then proceeded to disallow a claim "for four unsettled subcontractors." *Id.*

The court's dispositions, and its quotation of the Government's brief, necessarily imply that pass-through claims under standard termination-for-convenience clauses require settlement, but not payment. The court disallowed claims on behalf of "unsettled subcontractors." It allowed a claim, however,

based on the contractor's post-trial "settlement" with a sub.  It did not indicate whether the contractor had *paid* the latter sub, and did not suggest that it mattered.

Such a rule accords with the FAR's definition of a contingency as "a possible future event or condition . . ., the outcome of which is indeterminable at the present time."  48 C.F.R. (FAR) § 31.205–7(a).  That section of the FAR, which is among those expressly incorporated by the contract, provides that "[c]osts for contingencies are generally unallowable for historical costing purposes because such costing deals with costs incurred and recorded on the contractor's books."  *Id.* at § 31.205–7(b).  Once a contractor has entered a binding settlement agreement with a sub, the cost to the contractor of the sub's claim is no longer contingent.  It is not necessary to have *paid* a cost in order to have "incurred and recorded" it.  A settlement agreement, moreover, greatly reduces the risk that a contractor will recover from the government on a sub's behalf but then not pay the sub.

A settled-but-not-paid requirement, finally, also accords with the long-established rule that a contractor need not pay its sub before making a claim on its behalf.  *See George Leary Constr. Co. v. United States*, 63 Ct. Cl. 206, 223, 1927 WL 2960 (1927) ("It is easy to forecast the financial ruin of a Government contractor if the rule is to be established that he may not receive amounts due from the Government under his contract until he establishes . . . that he has paid

-55-

his subcontractor all he owes him."); *see also Severin v. United States*, 99 Ct. Cl. 435, 443, 1943 WL 4198 (Ct.Cl. 1943) (holding that, if contractor is liable to sub, "that liability, though not yet satisfied by payment, might well constitute actual damages to [the contractor], and sustain their suit" under rule that contractor may only sue to recover its own damages). *Leary* and *Severin* strongly suggest that, while the termination-for-convenience clause in this case may require GIT to have settled its subs' claims, this court should be leery of interpreting that clause to require that GIT have settled *and paid* those claims.

MK has never argued that GIT had to have settled *or* paid its subs' claims. GIT's brief thus responds only to the argument that it must have "settled and paid" the claims. GIT makes two counterarguments. One is that the *Severin* doctrine allows a prime contractor to sue on its sub's behalf so long as the prime "has reimbursed . . . *or remains liable*" to the sub. *J.L. Simmons Co. v. United States*, 304 F.2d 886, 888–89 (Ct. Cl. 1962) (discussing *Severin*) (emphasis added). The second is that, even if GIT cannot recover on the subs' unsettled claims under subparagraph F(1)(b), it can recover those claims as part of "the cost of this work" under subparagraph F(1)(a).

The *Severin* doctrine is, strictly speaking, irrelevant to whether the contract allows GIT to assert its subs' claims. *Severin* is a federal-common-law doctrine that prevents a prime contractor from making claims against the government on its sub's behalf if the sub has released it from liability. *See Severin*, 99 Cl.Ct. at

443–44; *see also George Hyman Constr. Co. v. United States*, 30 Fed.Cl. 170, 173–74, 177 n.14 (1994) (discussing and affirming continued validity of doctrine). *Severin* only sets a limit, based on privity of contract and sovereign immunity, on contractors' ability to press subs' claims against the government. *See George Hyman*, 30 Fed. Cl. at 173. The *Severin* doctrine does not *bar* GIT's claim, but it can not affirmatively *enable* that claim if the contract itself bars it.

*Severin* is nonetheless part of the body of law applicable to government procurement, which the contract incorporates. It may be relevant in determining how to interpret the contract. That includes how to interpret the "cost of this work" clause, on which GIT's second argument depends.

Courts have strictly limited the *Severin* doctrine, out of reluctance to leave subs with valid claims out in the cold. Courts have applied *Severin* only if the government proves that a sub has executed an ironclad, unconditional release of a prime. *See, e.g.*, *Simmons*, 304 F.2d at 888–89; *Folk Constr. Co. v. United States*, 2 Cl.Ct. 681, 685 (1983) (collecting cases). *See generally* Henry R. Kates, *Facilitating Subcontractors' Claims Against the Government Through the Prime Contractor as the Real Party in Interest*, 52 Geo. Wash. L. Rev. 146, 152–55 (1983). Post-*Severin* opinions often interpret releases and contracts very generously in order to let primes press their subs' claims. *See* Kates, *supra*, at 151–59. Those opinions also allow primes to rely on settlements with subs in which the prime's liability is conditional. In such agreements, the sub releases

the prime from any liability, and the prime promises only that it will press the sub's claim against the government and pay the sub whatever it recovers. *See Simmons*, 304 F.2d at 890; Kates, *supra*, at 155 n.80 (collecting similar cases). These opinions suggest that the courts which resolve most federal-contracting cases might broadly interpret the "cost of this work" clause if necessary to avoid leaving the subs unable to recover their costs.

GIT, however, has not cited any *Severin* case addressing whether the "cost of this work" clause, or federal-contracting law in general, allows a prime to recover its sub's costs without having settled with the sub. Courts applying *Severin* have neither expressly required a "settlement" nor specified that one is unnecessary.[38] That leaves this court free to interpret this contract to require a settlement. And while post-*Severin* courts have generously interpreted contracts in order to avoid leaving subs unable to recover, GIT's subs are in no such danger. If this court reads the termination-for-convenience clause to require a settlement, then GIT and its subs can negotiate settlements, and GIT can then press the subs' claims. GIT's *Severin* argument thus cannot itself justify recovery on the subs' claims, and cannot aid GIT's "cost of this work" argument.

GIT's brief focuses on *Severin*. It does not discuss why this court should read the "cost of this work" clause to permit GIT to recover its subs' unsettled

_____

[38]The oft-quoted *Simmons* opinion expressly requires only that a prime "remain[] liable" to its sub. 304 F.2d at 888–89. It does not require that the prime have reduced that liability to a binding settlement agreement.

claims.  Nor does it cite authority for such a reading.  It simply notes that the subs' claims are for costs incurred in the work.  MK replies by invoking the interpretive principle that courts should harmonize and give effect to every provision of a contract.  For GIT to press its subs' claims under paragraph F(1)(b), it must have settled those claims.  If this court nonetheless reads paragraph F(1)(a) to allow GIT to press its subs' unsettled claims, MK argues, it would rob paragraph F(1)(b) of any effect.

MK is not entirely correct.  It is easier for a prime to settle with a sub and then recover the amount of the settlement under the "settling and paying" clause than it would be to pursue recovery under the "cost of this work" clause.  If a prime has settled with its sub, then the government must accept the settlement's amount, within a broad range of reasonableness.[39]  A termination settlement need not strictly adhere to FAR cost principles.  *See* 48 C.F.R. §§ 49.201 & .303–5(d);[40] *see also id.* at § 49.113; 48 C.F.R. pt. 31.  A prime seeking to recover

---

[39]*See* 48 C.F.R. § 49.108–3(c) (governing review of prime's settlements with subs); *see,* e.g., *General Elec. Co.*, ASBCA No. 24111, 82–1 B.C.A. (CCH) ¶ 15,725, at 77,806, 1982 WL 7083 (1982) (approving bottom-line settlement amount "considered by [prime and sub] to be a fair . . . compromise price . . . arrived at after arm's length bargaining, without collusion, and [based on] a sound exercise of prudent judgment by [prime]"); *Codex Corp. v. United States*, 226 Ct. Cl. 693 (1981) (remanding for reconsideration because board strictly applied cost principles to settlement).  *See generally* Cibinic & Nash, *supra,* at 1114–15; *Gov't Contract Deskbook, supra,* at 326.

[40]"[B]usiness judgment, as distinguished from strict accounting principles, is the heart of a settlement."  48 C.F.R. § 49.201(a).  The regulation goes on to

(continued...)

the costs of settling with a sub under the "settled and paid" clause thus need not strictly prove the allowability, reasonableness, and allocability of all of the sub's costs. But if a prime sought to recover its sub's costs directly as a "cost of this work," without a settlement, then the cost-accounting principles of part 31 would apply to the claimed costs without any relaxation.

To allow a prime to recover its subs' costs under the "cost of this work" clause would thus not deny *all* effect to the "settling and paying" clause. Such an interpretation, however, would weaken the incentive for a prime and sub to settle before the prime makes a claim against the government. It would thus undermine the prime's duty to conclude such settlements.

MK bolsters its argument by asserting that the "cost of this work" cannot include unpaid, contingent costs. FAR cost principles support this argument. As noted above, those principles define a contingency as a possible future event or condition arising from causes whose outcome is not now determinable. *See* 48 C.F.R. § 31.205–7(a). "Costs for contingencies," the FAR provides, "are generally unallowable for historical costing purposes." *Id.* at § 31.205–7(b).

---

[40](...continued) specify that the parties may agree on a total settlement amount "without agreeing on or segregating the particular elements of costs or profit," and that "[i]n appropriate cases, costs may be estimated, differences compromised, and doubtful questions settled by agreement." 48 C.F.R. § 49.201(b)–(c). Settlements also require less record keeping. *See id.* at § 49.201(c).

Ultimately, whether the subs' costs are unallowable "costs for contingencies" depends on the perspective from which they are viewed. From GIT's perspective, its liability to the subs is indeed contingent. GIT's liability depends on the currently indeterminable outcome of its negotiations and litigation with the subs. MK stresses this perspective. But from the subs' perspective, their costs are not contingent: they have already incurred those costs. GIT stresses that perspective. The subs' *claims*, in short, are contingent, but the *costs* included in the claims are not.

Focusing only on the language of GP 55F(1)(a), GIT's position seems stronger. The paragraph refers to "cost," not "claims"; the subs incurred "costs" for the "work." But considering GP 55F as a whole and, more broadly, the structure of termination settlements, MK's position is stronger.

GP 55F provides in relevant part that,

If [GIT] and [MK] fail to agree on the whole amount to be paid [GIT] because of the termination of work, [MK] shall pay [GIT] . . .:

(1)  For Subcontract work performed before . . . termination . . .:

    (a)  The cost of this work;

    (b)  The cost of settling and paying termination settlement proposals under terminated subcontracts . . .; [and]

    (c)  A sum, as profit on subparagraph F(1)(a) above, determined . . . to be fair and reasonable.

GP 55F thus focuses on which of *GIT's* costs MK must pay. The "cost of settling and paying" under F(1)(b) can of necessity refer only to GIT's cost, not a sub's.

The "profit" allowed by F(1)(c) is GIT's profit. The reasonable profit earned by GIT's subs should be part of their settlements with GIT.[41] It would be inconsistent to read "cost" in F(1)(a) to mean "cost incurred by GIT or by its subs" when "cost" in F(1)(b) necessarily means "cost incurred by GIT," and "profit" in F(1)(c) means "profit earned by GIT."

More broadly, the standard federal termination-for-convenience clause, which is reproduced in GP 55, requires terminated contractors to settle with their subs. *See* 48 C.F.R. § 52.249–2(b)(5). A terminated contractor will thus liquidate its subs' claims and consolidate those claims with its own into a single settlement proposal to the government. *See id.* at § 52.249–2(e).[42] This approach reflects the general policy of federal-contracting law, which favors settlement over unilateral determination of termination damages. *See* 48 C.F.R. § 49.103.

---

[41]*See* 48 C.F.R. § 49.108–2(c) (measuring reasonableness of prime's settlement with sub by amount due to sub under standard termination-for-convenience clause, which includes profit); *see also id.* at § 49.502(e) (suggesting that primes insert standard termination-for-convenience clause in subcontracts)).

[42]*See also* 48 C.F.R. § 49.502(e)(1) (recommending that prime include standard termination-for-convenience clause in its subcontracts, with "the period[] reduced for submitting the subcontractor's termination settlement proposal (e.g., 6 months)"). The FAR thus envisions a set of contracts under which subs must submit termination-settlement proposals to primes within six months, while primes have a year to submit their proposals to the government. *See* 48 C.F.R. § 52.249–2(e). A prime can thus satisfy its duty to settle with a sub and have several months to incorporate that settlement in its own settlement proposal to the government.

The FAR contains not only standard termination clauses for federal contracts, but principles to govern terminations. *See* 48 C.F.R. pt. 49. The principles governing settlements with subcontractors begin by stressing the well-settled rule that a sub cannot sue the government directly. *See* 48 C.F.R. § 49.108–1; *see generally* Kates, *supra* at 146 & n.4 (collecting cases). The same section then notes that a prime is "responsible for the prompt settlement of the settlement proposals of [its subs]." 48 C.F.R. § 49.108–1. The statements' conjunction emphasizes that a sub must recover its costs by settling with the prime, not by directly suing the government. In this case, while the subs have not directly sued MK, it would nonetheless significantly undermine the FAR's settlement structure to accept GIT's theory. That theory suggests that, while a prime must settle with its subs, and while the subs may not sue the government to recover their costs, the prime may nonetheless sue the government to recover the subs' costs without first having settled with the subs.

FAR § 49.108–6 provides further evidence of the FAR's presumption that a contractor will settle its subs' claims before it settles its own claim with the Government. The subsection provides that, if a prime's inability to settle with a sub delays the settlement of the prime contract, the Government may settle with the prime. In so doing, however, the Government "shall except the subcontractor settlement proposal from the settlement in whole or part and reserve the rights of the Government and the prime contractor with respect to the subcontractor

proposal." 48 C.F.R. § 49.108–6. If a prime could directly recover its sub's costs under the "costs of this work" clause, there would be no need for a procedure to address situations in which a prime's inability to settle with a sub delayed its settlement with the government.[43]

The more natural reading of the two disputed paragraphs is that F(1)(b), the one that expressly refers to subs' claims, encompasses those claims, while F(1)(a) does not. This interpretation will not keep the subs in this case, or those in future wrongful-default-termination cases, from recovering their costs. In this case, a new trial is necessary, as discussed below. GIT and its subs can conclude settlements before that trial. *Cf. McDonnell-Douglas*, 40 Fed.Cl. at 555 (holding that contractor's claim on behalf of sub became valid after contractor entered post-trial settlement agreement). In future cases, primes and subs should know of the need to settle the subs' claims before the prime makes a claim against the government.

D.   Remedy on Appeal for the Erroneous Submission to the Jury of GIT's Attorney's Fees, Equitable Adjustment, and Subcontractor Claims

This court has concluded that the trial court erred in denying MK's motion for judgment as a matter of law (JMOL) as to three of GIT's five major categories of damages. Such a conclusion generally leaves this court three options: (1) order

---

[43]Neither party has pointed to this provision or suggested that it legally controls any aspect of this case; this court simply notes it as evidence that the FAR's structure presumes a requirement that prime contractors settle their subs' claims before presenting their own claims to the government.

the entry of JMOL ourselves, (2) order a new trial ourselves, or (3) remand to let the district court decide between the first two options. *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2540, at 370–72 (2d. ed. 1995) (citing *Neely v. Martin K. Eby Constr. Co.*, 386 U.S. 317, 327–30 (1967)).

Had the trial court used a special-verdict form, or supplemented the general-verdict form with special interrogatories, this court could possibly untangle the various categories of damages claimed and awarded below. We could then vacate any award of damages on the attorney's-fees, equitable-adjustment, and subcontractor claims, while letting stand any amounts the jury had awarded on GIT's other claims. *See, e.g.*, *Bone v. Refco, Inc.*, 774 F.2d 235, 242–43 (8th Cir. 1985) ("Had Bone's claims been submitted on special verdicts, we could simply have stricken the award on the [improper] claim and affirmed the judgment on the other claims."); *cf. Neely*, 386 U.S. at 329 (authorizing courts of appeals to order entry of JMOL on appeal from denial thereof). The district court, however, used a general-verdict form. It simply allowed the jury to award a lump sum if GIT prevailed on its wrongful-termination counterclaim.

The "general rule . . . is that when one of two or more issues submitted to the jury was submitted erroneously, a general verdict cannot stand." *Farrell v. Klein Tools, Inc.*, 866 F.2d 1294, 1298–99 (10th Cir. 1989) (citing *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 29–30 (1962)).

In this case, in which it was error to submit to the jury three of GIT's five major categories of damages, accounting for almost three-fourths of its total claim, the need to apply the general rule is patent. *See Blanke v. Alexander*, 152 F.3d 1224, 1232 (10th Cir. 1998) (noting that general rule would apply if court had let jury consider element of damages unsupported by sufficient evidence); *see, e.g.*, *Bone*, 774 F.2d at 242–43 (ordering new trial on damages because court used general verdict and erred in submitting one of three damage claims to jury). Because the general verdict makes it impossible to enter a judgment in GIT's favor on only part of the jury's verdict, a retrial is the only viable option.[44]

That conclusion leaves two questions about the scope of a new trial. The first is whether it should be limited to the issue of damages, or should include all issues. The second is whether GIT's failure to introduce sufficient evidence of certain types of damages warrants the entry of a JMOL in MK's favor on those claims, precluding GIT from pressing them on remand.

1.    *The New Trial Will Be Limited to the Issue of Damages*

If confusion or failures of proof regarding damages do not affect a jury's determination of liability, this court may limit a new trial to the issue of damages.

---

[44]MK's failure to move for a new trial does not foreclose that option. "'In an appeal from the denial of a motion for a judgment notwithstanding the verdict an appellate court may, in appropriate circumstances, instead order a new trial.'" *Magnum Foods, Inc. v. Continental Cas. Co.*, 36 F.3d 1491, 1502 n.13 (10th Cir. 1994) (quoting *Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471, 1480 (10th Cir. 1985) (citing *Neely*, 386 U.S. at 329)).

*See Magnum Foods, Inc. v. Continental Cas. Co.*, 36 F.3d 1491, 1497, 1506–07 (10th Cir. 1994); *Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471, 1480 (10th Cir. 1985) (citing *Brown v. Richard W. Wacholz, Inc.*, 467 F.2d 18 (10th Cir. 1972)). Courts of appeals have broad discretion in deciding whether to limit the issues when remanding for a new trial. *See Yehia v. Rouge Steel Corp.*, 898 F.2d 1178, 1184–85 (6th Cir. 1990); *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 293 (5th Cir. 1989); *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) (citing *Heckman v. Federal Press Co.*, 587 F.2d 612 (3d Cir. 1978)).

MK argues that this court cannot limit a new trial to the issue of damages, because that issue is not distinct and separable from the issue of liability. MK thus invokes the *Gasoline Products* exception to the general rule that a court may limit a new trial to specific issues. *See Mason v. Texaco, Inc.*, 948 F.2d 1546, 1552 (10th Cir. 1991) (noting that it must "'clearly appear[] that the issue to be retried is so distinct and separate from the others that a trial of it alone may be without injustice'" (quoting *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931))).

Courts and commentators have interpreted *Gasoline Products* to require full retrials in two instances. The first, and more common, is when an error or insupportable damages award calls into question the propriety of the *original* jury's finding of liability. The most common example is a compromise verdict, i.e., an award of suspiciously low damages in a case of closely contested liability.

*See, e.g., National R.R. Passenger Corp. v. Koch Indus., Inc.*, 701 F.2d 108, 110 (10th Cir. 1983); 11 Wright & Miller, *supra,* § 2814, at 154–56.[45] The second rationale for requiring a retrial on all issues does not look back to the propriety of the original jury's finding on liability. It instead looks forward to the new jury's inquiry. That rationale bars a limited retrial when two issues are inextricably intertwined. If a district court were to retry only one of two such intertwined issues to a second jury, while maintaining the vitality of the first jury's findings on the other issue, it would cause confusion and uncertainty and, thus, an unfair trial. *See Gasoline Prods.,* 283 U.S. at 500; 11 Wright & Miller, *supra*, § 2814, at 156–57 & n.14.

Such was the rationale of *Gasoline Products*, a breach-of-contract case in which the Court held that the court of appeals could not limit the retrial to the issue of damages. *See* 283 U.S. at 500. The Court noted that the first jury's overall verdict of liability had not included findings on such subsidiary issues as the dates of contract formation and breach, and the extent of the promised

---

[45]MK argues on appeal that the jury reached a compromise verdict, but MK waived that argument by failing to move the district court for a new trial on that ground. Unlike the grounds urged in MK's pre-verdict motions for JMOL, on the basis of which this court may order a new trial, the compromise-verdict ground can by definition arise only after a verdict. A party must therefore preserve that ground by moving for a new trial after the verdict. *See* Martin H. Redish, New Trials; Amendment of Judgments, in *Moore's Federal Practice 3d* § 59.55, at 59–136 (1997) ("Grounds for new trial that arise solely in the context of post trial proceedings must be presented to the trial court for consideration by a motion for new trial, and the failure to do so deprives the appellate court from [*sic*] any record that is reviewable for error.").

performance. *See id.* A second jury would have to know those facts to calculate damages for lost profits. *See id.* The Court held that "the question of damages . . . is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial." *Id.*

MK notes that the jury's determinations as to whether MK or GIT had caused various delays are relevant both to the wrongfulness of the termination and to GIT's entitlement to equitable adjustments. MK analogizes those two issues to liability and damages in a common-law breach-of-contract suit, and notes that the general verdict makes it impossible to determine which party the jury found responsible for any given delay. That problem is superficially similar to the problem in *Gasoline Products*, where it was impossible to discern the jury's subsidiary findings about the breached contract. *See* 283 U.S. at 500.

MK raises a valid point, but its argument is very brief. MK never argued this point to the trial court, as it never moved for a new trial. Nor on appeal does it explain exactly how, in a retrial limited to damages, the common issues would cause a jury such "confusion and uncertainty" as to preclude a fair trial. *Id.*

This court has not articulated any test more detailed than that stated in *Gasoline Products* for analyzing whether the issue of damages is clearly distinct and separable from that of liability in a given case. This court has not been hesitant, however, to find damages to be a distinct and separable issue. In a 1977

Federal Employer Liability Act (FELA) case, the trial court erroneously instructed jurors that, if they found the employer negligent, they should include medical expenses in the employee's damages. *See Trejo v. Denver & Rio Grande W. R.R. Co.*, 568 F.2d 181, 183 (10th Cir. 1977). There was no evidence of such expenses, and the employee had waived any claim to them. *See id.* The jury's general verdict awarded a lump sum for damages. *See id.*

In addressing whether to remand "for another full trial" or for "retrial only on the question of damages," this court first noted the rule that "damages and contributory negligence [are] normally so interwoven in a FELA case that it would rarely be proper 'to submit to a jury the question of damages without also permitting them to consider the conduct of the plaintiff.'" *Id.* at 184 (quoting *Norfolk So. R.R. Co. v. Ferebee*, 238 U.S. 269, 273 (1915)). Nonetheless, this court noted that the jury's verdict had two parts, a finding "in favor of the plaintiff," and an award of damages. We saw no reason to relitigate the first part's implicit finding that the company had been negligent: "Where, as here, we can protect the plaintiff's interest in the determination of liability without prejudicing the rights of the defendant, we should do so." *Id.* at 185. This court ordered that, on remand, the district court should instruct the jury that the company's liability "has been conclusively adjudicated"; that the company had to prove the employee's contributory negligence, if any; and that the employee "may counter with evidence of the Company's negligence for consideration by the

jurors in determining the comparative negligence of the parties." *Id.* This court thus ordered that a jury could consider, solely for the purpose of measuring damages, precisely the same issue of negligence on which liability had turned.

This court took a similar approach in a 1985 fraud case, in which it affirmed the verdict of liability, but remanded with directions to enter a remittitur order or conduct a new trial limited to the issue of damages. *See K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1162–63 (10th Cir. 1985). This court did so even though the measure of damages depended in part on the same factual issue as liability: what representations the defendant had made to the plaintiff.

In this case, the overlap of the factors bearing on damages and liability is significantly less complete than in *Gasoline Products*. In calculating damages, the second jury will not have to answer the same questions about who was responsible for each delay as the first jury had to answer in deciding liability. Each delay was caused either by GIT, by MK, or by something other than GIT or MK (by "chance," hereinafter). To show that a delay was excusable, and thus helped make the default-termination wrongful, GIT only had to prove that it had not caused the delay. If so, then it did not matter whether the delay was caused by MK or by chance. But to show that a delay is compensable, and can entitle it to damages, GIT must show that the delay was MK's fault. If not, then it does not matter whether the delay was caused by GIT or by chance. *See generally* Cibinic

& Nash, *supra,* at 543–618 (comparing excusable and compensable delays); Worthington & Goldsman, *supra,* § 11–8, at 392–93.

This distinction between the questions relevant to liability and those relevant to damages eliminates any risk that a retrial limited to damages will produce a verdict inconsistent with the verdict on liability. Even if the second jury finds that none of the delays were MK's fault, and thus does not award GIT any damages based on delay, such a verdict would not be inconsistent with the original verdict that the termination was wrongful. The two verdicts could be reconciled by assuming that there were enough excusable delays to account for GIT being behind schedule, but there were no delays which were MK's fault and which caused GIT to incur specific, reasonable costs.

This court does not rely simply on the potential reconciliation of the original liability verdict and a damages verdict upon retrial. More importantly, we note that the district court tried the case on the theory that GIT's entitlement to equitable adjustments based on delays is fundamentally separate from the question whether MK is liable for a wrongful termination. MK has not challenged that approach on appeal.[46] MK nonetheless argues that the issues of

---

[46]While this court need not resolve the issue, the district court's approach appears correct. The default-termination clause does not say how a default by GIT will affect GIT's entitlement to equitable adjustments if those adjustments are based on delays caused by MK before the termination. Authority suggests that GIT remains entitled to any such adjustments. *See* Cibinic & Nash, *supra,* at 1043 (saying that, after proper default termination, government may recover from
(continued...)

wrongful termination and equitable adjustments for delay are inextricably intertwined. That argument is substantially undercut, however, by MK's failure to challenge the proposition that GIT could recover equitable adjustments based on delay regardless of whether the termination had been wrongful.

There are fundamental differences between contract-termination damages under federal-contracting law, on the one hand, and breach-of-contract damages at common law, on the other. It is inapt to analogize the issues of wrongful termination and entitlement to equitable adjustments, in this case, to the issues of liability and damages in a suit governed by common-law contract doctrine. While common-law damages can only flow from a finding of liability for breach of contract, GIT's entitlement to "damages" in the form of equitable adjustments did not depend upon showing that MK was "liable" for a wrongful termination.

This disjuncture between liability and damages distinguishes this case from *Gasoline Products*. In that case, factual findings essential to determining whether a contract had been breached were equally essential to measuring damages, particularly, as the Court noted, damages for lost profits. In this case, certain factual disputes about each delay are relevant to the issues of wrongful

---

[46](...continued)
contractor excess costs of reprocuring work, but must reduce recovery to account for "all price increases to which the defaulted contractor is entitled" (citing board of contract appeals cases, including *Iran B. Tech Enter.*, ASBCA No. 24820, 81–2 B.C.A. (CCH) ¶ 15,424, at 76,442, 1981 WL 7164 (1981) (upholding default termination but awarding terminated contractor equitable adjustment))).

termination and equitable adjustments. But because those issues are essentially

independent, there is little reason to think that a prior verdict of wrongful

termination will confuse or inhibit a second jury in determining the equitable

adjustments, if any, to which GIT is entitled. There is, indeed, no need to instruct

the jury in the new trial on damages that the termination was "wrongful." That

fact is not relevant to the jury's task of determining whether GIT is entitled to

equitable adjustments based on delay, and in what amount. This court thus

concludes that the issue of GIT's entitlement to equitable adjustments is clearly

distinct and separate from the issue of the wrongfulness of its termination.

2. *This Court Cannot Direct the Entry of Judgment in MK's Favor on GIT's Attorney's-Fees Claim, and Declines to Do So on Its Equitable-Adjustment and Subcontractor Claims*

MK argues that this court should instruct the district court to award

nominal damages on remand, based on MK's view that GIT did not offer

sufficient evidence of any of its claimed damages.[47] This court has not accepted

---

[47]MK supports its argument by citing Colorado cases awarding nominal damages when a party's evidence of damages was insufficient. *See, e.g.*, *Colorado Inv. Svcs., Inc. v. Hager*, 685 P.2d 1371, 1375 (Colo. Ct. App. 1984). While state law governs a party's substantive entitlement to damages in a diversity case like this, it is well-established that federal law governs the grant or denial of a new-trial motion in diversity cases, and, at least in this Circuit, governs the determination whether evidence is sufficient to support a verdict. *See Blanke v. Alexander*, 152 F.3d 1224, 1235 (10th Cir. 1998) (new-trial motion); *Bankers Trust Co. v. Lee Keeling & Assocs.*, 20 F.3d 1092, 1099 (10th Cir. 1994) (sufficiency of evidence). It follows that federal law governs this court's decision how to remedy the trial court's error in finding GIT's damages evidence sufficient. *Cf. Firestone Tire*, 769 F.2d at 1480 (applying federal law in diversity

(continued...)

-74-

that view in its entirety. We could, however, direct the entry of JMOL, or an award of nominal damages, on those elements of GIT's claimed damages as to which a JMOL would have been proper, i.e., attorney's fees, equitable adjustments, and subcontractor claims. While the general verdict would still necessitate a new trial on GIT's remaining damage claims, this court could foreclose GIT from again claiming those three items.

As for the last of those items, GIT's subcontractor claims, this court has concluded that the error in allowing them was one of law, not insufficient evidence. As noted above, the Court of Federal Claims has indicated in at least one opinion that a contractor's post-trial settlement with its sub could enable it to press a claim on the sub's behalf. *See McDonnell Douglas*, 40 Fed.Cl. at 555. In this case the trial court should have required GIT to show that it had settled with its subs before allowing it to bring claims on their behalf. This court concludes the interests of justice require that GIT have a chance on remand to comply with that dictate, rather than have its claim barred. *Cf. Finley v. United States*, 123 F.3d 1342, 1349 (10th Cir. 1997) (holding that, because trial court granted plaintiff JMOL based on erroneous legal assumption that certain defense was not

---

[47](...continued)
case [*see id.* at 1483], albeit without discussing choice of law, in determining whether to grant JMOL or new trial after concluding that damages evidence had been insufficient).

available, so that defendant had no chance to prove defense, the interests of justice required a new trial rather than affirmance of JMOL).

That conclusion leaves the question whether GIT can claim on remand the attorney's fees and equitable adjustments of which it failed to produce sufficient evidence. In *Firestone Tire*, an appeal involving insufficient evidence of damages, this court applied the general federal rule: "In an appeal from the denial of a motion for [JMOL] an appellate court may, in appropriate circumstances, instead order a new trial." 769 F.2d at 1480 (citing *Neely*, 386 U.S. at 329). To apply that rule to the attorney's-fees and equitable-adjustment issues in this case, however, is to give GIT a second bite at the apple, i.e., a second chance to marshal the evidence it failed sufficiently to present in the first trial.

The force of that argument is particularly clear as regards GIT's egregious failure to timely produce any evidence of its attorney's fees. Despite its force, however, the argument is foreclosed. MK failed to renew its pre-verdict Rule 50(a) motion for JMOL on that issue in a post-verdict Rule 50(b) motion. As discussed *supra* at 46–47, that failure limits the relief which MK may obtain on appeal to a new trial.

No such procedural lapse, however, prevents this court from ordering entry of a partial JMOL based on GIT's other evidentiary failure, i.e., the failure to produce sufficient evidence of how MK caused it to incur specific, reasonable costs entitling it to equitable adjustments. MK twice moved for JMOL near the

end of the trial on the ground that GIT's evidence of the causation of its damages was insufficient. It made its first motion orally on the day after GIT's damages witness testified. The court summarily denied the motion after MK's counsel had briefly stated it. MK filed a written motion several days later, on the morning of the last jury-instruction conference. During the conference, MK's counsel briefly brought up its Rule 50 motions. After the court said that it had not yet had time to read the written motions, MK's counsel noted that "[s]ome of the motions . . . we've presented already, i.e. . . . lack of causation of damages." The court immediately replied that, while there had been some new evidence since its last ruling, "there is no change in my opinion as a result of the additional evidence."

In these circumstances, GIT had little occasion to try to remedy the defects in its proof. Had the court not promptly orally denied MK's motions, GIT could have moved for leave to reopen its case to provide additional evidence. *See, e.g., McKinnon v. City of Berwyn*, 750 F.2d 1383, 1388 (7th Cir. 1984).[48] Giving a party a chance to correct defects in proof is a primary purpose of the preverdict motion for JMOL under Rule 50(a), and in particular of the requirement that the motion specify the grounds for granting judgment. *See* Fed. R. Civ. P. 50(a)(2), advisory committee's note (1991 amend.) (stating that purpose of requirement for

---

[48]In addressing an oral JMOL motion on a different topic which MK made at the same time as its oral motion regarding causation of damages, the court said, "I'm going to take that one under advisement and consult the case law, and I'll give GIT an opportunity to argue if I am inclined to grant that."

preverdict motion for JMOL "is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked"); *see also, e.g., Waters v. Young*, 100 F.3d 1437, 1442 (9th Cir. 1996) (holding that either motion or court must apprise party of specific deficiencies in its proof, and that court must allow party opportunity to offer further evidence before granting JMOL); *Holmes v. United States*, 85 F.3d 956, 962 (2d Cir. 1996) (noting that purpose of preverdict motion is to enable party to remedy deficiencies in proof); *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 716 (7th Cir. 1987) (similar); *see generally* 9A Wright & Miller, *supra*, § 2533, at 309–11 & 1998 Supp. at 63.

While MK's motions for JMOL sufficed to notify GIT of the specific deficiency in its proof, the court's immediate rejections of those motions make it impossible to say whether, had the court taken the motions under advisement, GIT might have taken steps to buttress its case. This court must consider that fact in exercising its discretion to order either JMOL or a new trial. Courts of appeals have often ordered new trials rather than JMOL when a plaintiff could likely remedy its deficient evidence in a new trial. *See, e.g., Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 785 (D.C. Cir. 1998) (ordering new trial because "we believe Smith's failure of proof . . . may be remedied"); *Network Publications, Inc. v. Ellis Graphics Corp.*, 959 F.2d 212, 215 (11th Cir. 1992) (holding that district court erred in granting JMOL instead of new trial where

insufficient proof of damage amount was likely remediable); *Persinger v. Norfolk & W. Ry. Co.*, 920 F.2d 1185, 1189 (4th Cir. 1990) (similar); *cf. Universal Bankcard Sys., Inc. v. Bankcard Am., Inc.*, 998 F.Supp. 961, 967 (N.D. Ill. 1998) (noting that "even [if] there is a complete failure of proof on the amount of damages . . . the trial judge can order a new trial in lieu of entering judgment," but declining to do so, because, "despite repeated warnings from me, the plaintiff made no effort to introduce such evidence. This leads me to believe that the evidence does not exist.").

This court employed similar reasoning in *Firestone Tire*. *See* 769 F.2d at 1480. Plaintiffs proved a breach of contract but presented to the jury a damage calculation erroneously based on lost gross revenue, not lost profits. *See id*. Noting that plaintiffs' damages were complex and difficult to prove, this court held that "the interests of justice require a new trial as to the proper amount of damages, rather than a [JMOL]." *Id*. In this case as well, the trial was long and complex, as MK itself has stressed. The district court, moreover, summarily rejected MK's Rule 50(a) motion claiming that GIT's evidence of equitable adjustments was insufficient, without in any way suggesting that GIT might need to supplement its evidence on that issue. This court concludes that the interests of justice require that GIT have a chance to do so before its equitable-adjustment claims are dismissed.

3.   *Conclusion*

This court will thus remand this case with instructions to the district court to conduct a new trial limited to the issue of damages. This conclusion moots the remaining issues the parties have briefed.[49] On remand, the district court should instruct the second jury to examine each of GIT's equitable-adjustment claims based on delay. The jury must determine whether MK caused each delay in a manner unauthorized by the contract. If so, the jury must further determine whether the delay caused GIT to incur allowable, reasonable, allocable costs. The jury must also, of course, resolve GIT's other claims for damages, as instructed by the court in accord with the contract and relevant law.

III. CONCLUSION

This court **affirms** the judgment insofar as it incorporates the jury's verdict that the default-termination was wrongful and that MK was not entitled to recover from GIT for a breach of contract or from Fireman's Fund under the performance bond by which it insured GIT's performance. This conclusion eliminates any claim against Fireman's Fund. This court **vacates** the judgment insofar as it

---

[49]GIT cross-appealed the trial court's denial of its motion for summary judgment on MK's breach-of-contract claim. GIT had argued that MK could not sue, as all funds spent on the project were the government's, not MK's, and MK thus had suffered no damages. Although GIT asserted that its cross-appeal "raises an important policy issue regarding . . . subcontractors on federal projects," its counsel conceded at oral argument that, if this court affirms the verdict on liability, it will moot the cross-appeal. This court agrees. Our vacation of the award of damages, meanwhile, moots MK's argument that the trial court erred in awarding GIT prejudgment interest on the jury's verdict.

awards GIT damages on its counterclaim against MK, and **remands** the case for a new trial limited to that issue.